Steven D'Agostino
25 Nautilus Dr.
Barnegat NJ 08005

| | |
|---|---|
| Steven D'Agostino<br>Plaintiff | UNITED STATES DISTRICT COURT<br>OF NEW JERSEY |
| v. | CIVIL ACTION |
| The Honorable Heather Wilson, Secretary of the United States Air Force; The United States Air Force; Charles M. Dunn; Mika Beard; W.T. Little; The United States Department of Defense; and The United States Army<br>    Defendants | COMPLAINT |

**Plaintiff Steven D'Agostino, by way of complaint against the above-captioned defendants, says as follows:**

### THE PARTIES AND THE RELATIONSHIPS AMONG THE PARTIES:

1) Plaintiff, Steven D'Agostino (henceforth referred to in the first person) was twice employed by the United States Department of Defense. I was first employed as an Electronics Engineer / Computer Scientist with the United States Army CECOM at Fort Monmouth from Sep 1988 thru Mar 2002, and later from Mar 2013 thru Sep 2013, as a Visual Information Specialist with the United States Air Force 87FSS Joint Base McGuire Dix Lakehurst marketing department.

2) Defendant Heather Wilson is the Secretary of the United States Air Force and the head of the Department of the United States Air Force, and she was listed in the final agency decision as the proper party to be named as the defendant in this civil suit.

3) Defendant United States Air Force is a military branch of The United States Department of Defense.

4) Defendant Charles M. Dunn was the head of the marketing department and my immediate supervisor for my position with the United States Air Force 87FSS, who directly initiated and/or participated in the wrongful acts as alleged within this complaint.

5) Defendant Mika Beard was Mr. Dunn's "second in command" of the marketing department for the United States Air Force 87FSS, and she directly initiated and/or participated in the wrongful acts as alleged within this complaint.

6) Defendant United States Army is a military branch of The United States Department of Defense.

7) Defendant United States Department of Defense (henceforth "DoD") is the "parent" organization of both the United States Air Force and the United States Army.

### JURISDICTION AND VENUE:

8) This Court has jurisdiction over the action because the complaint involves one or more defendants whom are entities of the United States Government. This action is being brought under *29 C.F.P. § 1614.407*, for violations of: the Rehabilitation Act; Title VII; and the ADA; (also common law, both tort and contract). And all other remedies have been exhausted, as I received the final agency decision on Oct 19, 2018, which was adverse to me. And prior to that, the EEOC had administratively dismissed the EEO complaint with prejudice in 2015 (which was extremely unfair, as the EEOC never heard the matter on the merits).[1]

### SUMMARY OF COMPLAINT:

9) In Mar of 2013 I was hired by the United States Air Force, and from that time until my employment was wrongfully terminated in Sep 2013 (i.e. for the entire duration of that employment), I was directly discriminated against, repeatedly subjected to a

---

[1] The EEOC dismissed my complaint completely, solely because of a missed preliminary telephone conference. The presiding Administrative Law Judge (ALJ) had scheduled a date and time for this telephone hearing, but I was the only person to appear on that date and time. However, neither the Air Force, nor the other ALJ who was to conduct this conference, appeared at all! The Air Force had also failed to comply with the presiding ALJ's prior order to send me its contact info. Further, the other ALJ was not even in her office when I called at the scheduled date & time for the hearing. Yet incredulously, the ALJ who herself had missed the scheduled hearing, would later blame me for it! And she took the unusually harsh measure (as opined by several attorneys who regularly represent federal employees in EEO complaints) of dismissing my EEO complaint with prejudice.

hostile work environment, and then was even cheated out of pay in the end - all because of my disability (a sleep disorder). Then I was wrongfully terminated, in direct retaliation for my filing of an EEO grievance just one day earlier.

10) The above-described conduct was, in essence, a continuing wrong of what had occurred within my first DoD employment (i.e. my career job with the United States Army), where my sleep disorder disability was used indirectly against me, and was ultimately a requisite link in the chain for the eventual wrongful termination. It later was used as a basis for its refusal to rehire.

## FACTUAL BACKGROUND:

OVERVIEW AND CHRONOLOGY

11) For my career employment with the US Army, I was offered an unofficial accommodation in 1996 for my sleep disorder, after the surgery I had in 1995 did not alleviate the problem, and after the approval for my part-time schedule had been later overturned by higher up the chain. I then lost that career job in early 2002 as a direct result of the last immediate supervisor I had been assigned to (in Oct of 2000), whom had a personal dislike of me. He used my sleep disorder and my resulting later-than-average daily starting times to justify his lower-than-average performance ratings of me, then used those subpar ratings as leverage to impose the harshest possible discipline (i.e. having me fired) when a few months later he had found another ruse to use against me as a supposed violation. And I would have easily won that case at arbitration, if not for the grossly negligent and incompetent buffoon of an attorney I had hired.

12) On May 12, 2009, I obtained a unanimous jury verdict against my former attorney (i.e. the aforementioned grossly negligent and incompetent buffoon) of $330,000, which together which interest, was $385,399 in May 2009. But it would eventually turn out that he would never pay a penny on the judgment, and he died in May 2017.

13) Shortly after wining my verdict, I wrote to the attorney for the US Army who prosecuted my removal action, seeking to have my employment reinstated. In her reply, she conceded that the jury's verdict established that I would not have lost my job, except for my former attorney's negligence. But she still refused to give me back my job, on the pretext of my having poor job performance ratings, which were only reduced because of the inadequate accommodations for my sleep disorder.

14) Then in Mar of 2013, over ten years after the loss of my employment with the US Army, I was again hired by the Dept. of Defense, but this time with the United States Air Force.

15) But here, unlike what I had experienced at my job at Fort Monmouth, I was <u>directly</u> discriminated against, repeatedly subjected to a hostile work environment, and cheated out of pay, all because of my disability (a sleep disorder). Then in Sep 2013, I was wrongfully terminated in retaliation for my filing of an EEO grievance.

16) In Mar 2013, I was hired by the United States Air Force, to provide services to all 3 branches of the United States Department of Defense (Army, Navy, Air Force) at the Joint Base McGuire Dix Lakehurst, as a Visual Information Specialist with the 87FSS marketing department, after being interviewed by both Charles "Monty" Dunn (i.e. the head of the marketing department, who would later become my supervisor) and Mika Beard (Monty's second in command, and his personal favorite) in Feb 2013

17) During my Feb 2013 interview, I told them of my sleep disorder, and my requested schedule (to start work at noon time). So even before I was hired, both Monty and Mika knew that I would need an accommodation for my sleep disorder of a late starting time. They would later admit to this fact during the EEO complaint stage.

18) However throughout my employment, I was treated disparately from my coworkers (i.e. Monty, Mika, and the other 3 employees in the marketing department). My coworkers seemingly resented me because of my starting time, and repeatedly made my working atmosphere a hostile one. Monty and Mika sat behind a wall from the rest of the 4 of us in the marketing department (i.e. myself, Chris Moses, Jessica Weaver, and Jodie Stukes), who were all in the same front room (of no more than 400 sq. ft., and without any partitions or barriers, and all 4 of our desks were facing each other). None of my coworkers would ever talk to me unless they absolutely had to, and they would often even ignore me when I would try to talk to them. Particularly in the front room with the 4 of us, the other 3 would all talk constantly amongst themselves, and sometimes even shout to Mika and/or Monty in the room(s) behind us, but yet completely ignore me as if I was not even there. And even when I tried to interject myself into a few of those conversations, they would barely respond to me at all, and then they would almost instantly end the conversation. Even when I arrived for work and said "Good morning" to them, all 3 of them would just look at me with an angry stare, and did not say a single work in reply. In fact, even if I sneezed, nobody would even say "God bless you" to me, but they would all always say it to each other when any one of them sneezed. And even as to the office policy of taking people out to lunch on their birthday, along with a birthday card, and sometimes even with a cake in the office after lunch, they did that for ever body else but me. But for my birthday, absolutely nothing – nobody even said "Happy birthday" to me, let alone give me a card, let alone take me out for lunch, etc. But because I was so grateful to have job that would accommodate my sleep disorder, for more than 5 months time, I never made a fuss about it. And I only did so after I got grossly short changed on my pay, and then after when Monty was aloofly brushing me off about it when I brought it to his attention.

19) My work task was to maintain the existing marketing website, gomdl.com. (I had also built a completely new website from scratch that was customized to their ideal dream requirements, but although that new website was fully tested and ready to go, they never gave me approval to launch it. Thus for the last 2-3 months of my employment, I was maintaining the data and information for 2 websites – both the old existing one and my own - such that as soon as they gave me the green light, the new website would be ready to go instantly with all of the current information and data already entered / uploaded).

20) But doing the maintenance on even 2 websites did not take much time at all. That is, with the exception of one day per month when all of the upcoming events were released for publication, for the other 29 days each month, the total work I needed to do usually was less than an half hour of my time to complete. So since I almost always had 7 and a half hours leftover and nothing to do, I constantly offered my help to my coworkers, and they almost always refused, and sometimes seemed to get annoyed at me for even offering. I also did a lot of menial tasks around the office, and around the building, without even being asked to do so. For example, even aside from computer-related stuff such as running network cabling, fixing computer / printer glitches, etc., I also helped with the maintenance and repair of the marketing department's van, I did dirty and disgusting jobs such as fixing the broken toilet seat in the men's room, as well as the broken toilet paper holder and the clogged drain. I cleaned and mopped the kitchen floor and counters, took out the garbage. I brought my own shop-vac from home to try to clean the carpets and control the pest problem we had in the building (roaches, ants, mice, and in the summer time, house flies). I also tried to help with the building maintenance, the leaking and flooded Air Conditioner unit in the back of the building, the mold problem (in the kitchen and in some of the drop ceiling tiles), and much much more. But yet it seems that none of that did anything to help how I was treated by my coworkers. In fact, I was considered so low on the totem pole, that in Aug 2013, Mika had publicly humiliated me in front of a person who was external of our office, simply because I was offering my knowledge and expertise about a technical issue I had years of expertise in. But yet whenever another marketing team member tried to offer his/her help, and/or share his/her knowledge, Mika never treated them that way.

21) On Tuesday Sep 3, 2013, Monty returned from his 2-week vacation / furlough /sequestration, and I asked him about the $98 I had been short changed on the previous period pay period (ending on Aug 23, 2013). He then said I wasn't short changed, and amongst other things, said that I couldn't get any credit for the time I spent at lunch, even if it was on base (which was different than the policy at Fort Monmouth, where your lunch break counted as official time as long as you remained on base). He also said he didn't care when I arrived, I could arrive at 2:00 PM and leave at 10:00 PM, as long as I put in 8 full hours of sitting at my desk. Thus if I left my desk for a half-hour lunch break, then I would need to stay until 10:30 PM. But if I ate my lunch at my desk, then that would be part of my 8 hours official time. I told him how I had nothing to do for most of the day, and that nobody wanted to let me help them with any of their stuff. He trivialized my complaint of being humiliated by Mika, and in so many words, he made it seem like it was my fault for trying to help her. He told me that my job was sitting my butt in the chair for 8 hours, and not to keep volunteering my help to anyone (if they wanted my help, they would ask for it). The conversation was polite, calm and cordial, and ended on positive note, as we had solid understanding of each other's perspectives (although I was not happy about needing to sit in a chair 8 hours a day with nothing to do, where the time was going to tick by excruciating slowly since nobody would even talk to me, let alone ask me to do something to help).

22) But then 3 days later, on Friday Sep 6, 2013, I saw that I was only paid for 26 hours out of an 80-hour pay period, so I was very upset and I brought it to Monty's attention immediately. But then after Monty was brushing me off about it rather aloofly (i.e. half-heartedly saying "I'll look into it, that's the best I can do"), that was when I reached my breaking point, and I told him I was tired of the repeated disparate treatment I always got, and that if my pay didn't get fixed immediately, I would file a formal grievance against him and Mika, because I was tired of this, Monty responded by throwing me out of his office, saying: "Nobody threatens me or my staff, EVER! You're done. We're done." This resulted in my spending the rest of Friday Sep 6th applying for, and qualifying for, Telework (a certificate was generated, which I printed out).

23) On Monday Sep 9th, after my pay still wasn't fixed, I went over to the Human Resources HR office, and explained the situation I was having (about my pay and about my working conditions in general), but they too seemed to brush me off. I then tried to speak to the base's legal department, but was told that they only see people on Tuesdays.

24) So the next day, Tues Sep 10th, I went over and spoke to the legal team, but they said that although they appreciated my trying to work out my issues amicably, they couldn't speak to me at all about any of it. I then went and spoke to Tsgt. Collins, the base EEO officer, and she started my complaint / formal grievance of the disparate treatment and hostile work environment I was enduring as a result of my disability (i.e. my sleep disorder)

25) The next day, Wed Sep 11th, I signed my formal grievance against Monty and Mika, which Tsgt. Collins had prepared for me.

26) However, the very day, Thurs Sep 12th, Monty called me in his office and gave a termination letter. The supposed reasons for my termination were: 1) that I arrived an hour late for a picnic (which was an exaggeration); 2) that I supposedly arrived at after 1:00 PM on Friday Aug 30th (which was a lie – I arrived had a little after 12 noon, maybe 12:30 at the latest); and 3) that I don't work well with my team members, and complain when I am asked to help them (which is a gross lie and 180 degree distortion of the truth – they never asked for my help, and I would have been more than happy to help them with anything they needed a hand with). The effective termination was for the next day, Friday Sep 13, 3013.

27) The truth was is that I was fired in direct retaliation for filing the grievance, which is illegal and in direct violation of the "NO FEAR Act", which Col. Hodges had just electronically sent out a flyer about to all of the base employees.

28) I then continued to meticulously pursue my EEO grievance, for all stages, but everything took much longer than it was supposed to. During this process, and in reply to my EEO complaint, my coworkers (no doubt coerced by Monty and Mika) gave conflicting stories of my trying to help and be a team player, but more or less admitted that they didn't want my help, and that I usually arrived before noon, and that I arrived before 11:00 AM on the day of the picnic. Monty admitted that I threatened to file a formal grievance against him and Mika on Friday Sep 6, 2014, but then he lied by stating that his decision to fire me had been made the day before, on Thurs Sep 5th (a day which came and went without any incident at all). Unbeknownst to Monty, I had secretly recorded my conversations with him on both Tuesday Sep 3rd and Friday Sep 6th, where on both days he said I could arrive as late as I needed to, as long as I put in a total of 8 hours. It wasn't until about 8 minutes into the conversation on Friday Sep 6th when I then threatened to file the EEO grievance. And it was only at sometime after that, did he decide to fire me, and in direct retaliation for filing my EEO grievance.

29) Many months passed with every stage of the EEO grievance taking much longer than it was supposed to.

30) Finally, after the informal EEO grievance was denied, it went up to the EEOC in Philadelphia. And then months over due, a preliminary telephone hearing was scheduled with the Philadelphia EEOC for Feb 2015, with Administrative Law Judge (ALJ) Dawn Edge (who was assisting the Presiding Judge Francis Polito, the latter of whom was assigned to my case). But on the day of the hearing, I called the EEOC at the scheduled time of 10:00 AM. But neither Judge Edge nor Judge Polito were in their offices. Finally at a little after 11:00 AM, I got a return call from Judge Edge's clerk/secretary, and he said that he did not get a call from the Air Force lawyer that morning either, so he would have the judge get back to me. Later when she called me, we discussed the issue, and I learned that the Air Force was supposed to have contacted me, at least 10 days in advance of the hearing, to get my phone number, as they were supposed to initiate the call for the telephone conference hearing.

31) However, the Air Force did not do so. Instead, their Lawyer (Capt. Poole) has only contacted me via email (not postal mail), and he had only done so just 6 days prior to the hearing, wherein he requested my phone number. Unfortunately, I did not see the email, which was routed to my spam folder, until after the date of the hearing had already passed. I don't know why he waited until only 6 days beforehand, or why he didn't just call the number that was listed all over my employment paperwork (and within the grievance paperwork), which would have been the same as my then-current phone number. But either way, the fault was on the Air Force's end, and also that the judges weren't even in their offices that morning either.

32) However incredulously, Judge Edge later ruled it was my fault for not following the procedures, and took the unusual and extremely harsh step of dismissing my EEOC complaint completely, with prejudice!!!! This was an outrage, as first of all, it was the Air Force who failed to comply with its requirements to contact me at least 10 days in advance, and failed to even attempt to contact me at the listed phone number it had on file. Second, any failure by either party would have been harmless, as neither Judge Edge nor Judge Polito were in their offices at the scheduled time and date. So even if both of us had called in that morning for the telephone hearing, the judges would not have been in. Thus, as several attorneys who handle federal employment matters have since told me, that was extremely unusual and extremely harsh, as scheduling conflicts often arise and hearings commonly need to be rescheduled, sometimes even without prior notice as things can come up at the last minute. And especially given that if there was any fault on my part at all, at worst it was due to a failure to check my spam folder often enough, which itself was a direct consequence of a direct failure on the part of the Air Force to contact me at least 10 days beforehand via postal mail, and in addition to the failure of the judges themselves to be present, this was an absolutely unfair decision. I firmly believed then, as I do now, that Judge Edge was just lazy and did not care one iota about fairness to me, she just wanted to get another case off of her docket to make her own job easier. When I later spoke to Judge Polito about it, he seemed to sympathize with me, but he did not (or perhaps he could not) overrule her dismissal. He said I couldn't do anything until I received a decision from "FO", and also stated with certainty that the FO decision would be adverse to me.

33) On Oct 19, 2018, I finally received that decision from the agency, and sure enough, it turns out that Judge Polito was right – the decision was adverse to me. Thus, within 90 days of my receipt of that decision, I am timely filing this Civil Complaint in the United States District Court.

## DETAILS

### My Sleep Apnea / Upper Airway Resistance

34) For more than the past 25 years, I have had a medically documented sleep disorder, sleep apnea and upper airway resistance. This condition has caused problems in my previous employment, including being a major factor as to why I was fired from my 13.5-year long position with Fort Monmouth as an Electronics Engineer / Computer Scientist.

35) Since the early 1990's, I was having increasing difficulty getting up for work, but I didn't know it was medically related. My girl friend at the time complained that my snoring was keeping her awake, and also in 1992 I was taking voice lessons but having trouble with performing certain exercises, that was when I went to have the first test done in November of 1993. I was

first diagnosed with obstructed breathing during sleep in Nov 1993 (at that time, it was only snoring). Afterwards, the doctor (whom was a speech pathologist) asked me if I ever had jerky leg movement when excited, which surprised me that how could he have known that. After I answered yes, he then asked me about my sleeping, and after I told him about that, he told me I should have more tests done and suggested I go see an ENT sleep specialist. A year and a half later, I was diagnosed and surgically treated for sleep apnea.

36) In August of 1995, I was surgically treated for Obstructive Sleep Apnea / Upper Airway Resistance. Further sleep studies in 1997 and 2001 also showed poor sleep and obstructed breathing during sleep. Further tests were ordered in Feb 2002, but at that time I had lost my job from Fort Monmouth (which was in part a result of my sleep disorder), so I couldn't afford it as I no longer had any healthcare.

37) My sleep apnea makes it difficult for me to fall asleep, and then when I finally do, it makes it difficult for me to wake up the next morning. If I force myself awake with an insufficient amount of sleep, then I am very drowsy and don't feel safe to drive. Although I can push it (and I have done so many times in the past and I have been fortunate enough to get away with it without having an accident), it is still very unsafe. Infact, recent studies have found that driving while being sleep deprived is just as dangerous as driving while being intoxicated.

38) So when I was interviewed for this position with the Air Force in Feb of 2013, I made sure to mention this sleep disorder (i.e. disability). Nobody ever expressed any doubts of my actually having this disability, and nobody asked me for any medical documentation of this disability.

39) My sleep apnea did not affect my ability to complete my work tasks though (at either my position with Fort Monmouth or my position with the Air Force). I was still able to perform all of the duties, as I was sitting at desk in front of a computer. And this was particularly true at o the latter, where I log into the website's server and perform whatever maintenance tasks the happen to be needed that day. I could have logged in to make changes from home; which is why I wanted telework, since my work could be done remotely. The position was not technically complicated; the work involved mostly data entry.

My job position and duties

40) From Mar through Sep 2013, I occupied the position of Visual Information Specialist, NF-1084-3, 87th Force Support Squadron, Marketing Dept.

41) I had only learned of the availability of this current position by accident in January of 2013, when my car broke down a few miles from my home and a lady stopped to help me. As she was driving me back to my house, we spoke and she mentioned her husband (Charles "Monty" Dunn) worked for the Air Force, and they desperately needed a web developer but could not find one.

42) After a couple phone calls, an interview was scheduled at the base. I met with Mr. Dunn, as well as the lady whom was second in charge, Mika Beard. The interview seemed to go very well, and I was surprised why they could not find a web developer. Then I learned that the pay for this position was only $18 per hour. So that explained to me why they could not find anyone, as even junior level web programmers, with no experience at all, make much more than that. For example, I just recently saw a job posting where they offered to teach the job applicant to learn programming on the job, and that position offered a salary of $45,000 per year. (i.e. $22.50 per hour, assuming if they worked a typical 40-hour work week with a 2-week vacation). Mr. Dunn later confided in me that even college kids fresh out of school with no experience at all were not interested in working for such low wages as this position offered. Although maintaining the existing (and inefficient) gomdl.com website did nto require much skill or expertise, the work needed for the ideal candidate for this position required at least a mid-level, if not a senior-level web programmer, to be able to rebuild the inefficient existing gomdl.com website, which was/is an over-bloated version of the Word Press platform. I am a senior-level programmer, but because of my sleep disorder, I know that makes me undesirable in the eyes of many employers.

43) So before I was hired, during my initial interview with Mr. Dunn (Mika Beard was also present during this meeting) I made it clear to them that I had this problem, and it had resulted in (or contributed to) my being terminated from 2 other jobs (i.e. including my job at Fort Monmouth). Mr. Dunn asked me what my ideal starting time would be, and I responded "noon". He then tilted his back and laughed, and said he understood. I had also mentioned about my previous employer being a stickler for insisting that I was at my desk for a full forty hours, and that I was not looking to be in another situation like that. Mr. Dunn said he did not expect any of us to be seated at our desks the whole time, instead he expected us to get up and take breaks, go out for a walk, etc. I also mentioned ideally I would like to work from home, at least on a few days a week.

44) I did not hear any response, so over the next month and a half I made a few more calls, until finally in mid-March he called me back to tell me that I was hired and to come in and get signed onboard. During that call, he asked me if for the first 2 months I could get in by 10:00 AM, and after that he would work out the later starting times I needed. During the first 2 months, I pushed myself very hard to get there by 10 AM, but even still there were a few times where I was unsuccessful and I arrived after 10 AM.

45) My job officially commenced Mar 25, 2013 (although my first day for work was scheduled a few days later). My only task was to maintain / enhance the marketing department website, gomdl.com. The marketing dept. was previously within the Department of Morale and Welfare for Fort Dix, (which is now combined under the joint commands for the Army, Air Force and Navy). The gomdl.com website is the joint base website that lists events (both on and off base) to increase the quality of life for those living on the base, such as things to do, places to go, etc., in the surrounding geographical location. I would make updates to the gomdl.com website of new events and/or changes. The task(s) did not take very long to complete, for most days all of the updates combined may take up to only 30 minutes.

46) I did my job exceptionally well, and I even had designed an entirely new software platform to replace the WordPress system that is currently used on the gomdl.com website. I had fully implemented and built this software 100% operational, and I had even created complete documentation for it.

My supervisors, the disparate treatment, and the hostile work environment

47) Charles "Monty" Dunn was my immediate supervisor, above Mr. Dunn was Mr. W T Little, and above him was Major Randolph. Both Mr. Dunn and Mr. Little were my supervisors the entire time of my employment, However, Major Randolph only came to the base sometime in August 2013, as I recall. My immediate supervisor, Mr. Dunn, and my coworker Mika Beard (who was Mr. Dunn's unofficial second in command) both resent the fact that they both frequently choose to put in uncompensated overtime (due to the office workload), and because of my sleep disorder, I arrive for work much later than they do (and I also left work before they did).

48) Mr. Dunn and Ms. Beard spoke to me in a noticeably different tone than they did to other marketing department employees. Although they both usually were civil towards me, their tone was not warm and friendly, like they were with everyone else on the team. I was treated differently, such as on my birthday I was not taken out or given a card. I I knew I was considered the outcast, but because I was so desperate for a job, I didn't complain. I needed my job, both for a reliable source of income and for health benefits.

49) And it seems clear to me that their disrespect for me apparently rubbed off on the other team members (i.e. Jessica Weaver, Jodie Stukes, and Chris Moses) as well. For instance, when I would arrive (usually between 10:00 AM to 11:00 AM) and greet the 3 of them with "Good morning", all 3 would just look back at me with an awkward stare and not say a word. It was so bad that even when I sneezed, nobody would even say "God bless you"; however, when anybody else of the 3 sneezed, the other 2 always said "God bless you" to the sneezer. And although all 3 of them would talk with each other throughout the day, they never would talk with me, and if I tried to interject myself into any of their conversations (work related or otherwise), they would then quickly end the conversation. Nobody wanted to talk to me or interact with me at all, and I was always kind, polite, respectful, helpful and considerate to everyone.

50) As for working well with my team members, I always did so, or at least I certainly always tried to do so. I was always polite, considerate and helpful. The 4 of us all sat in a large open room. I sat next to Mr. Moses, and across from Jodie and Jessica. All 4 of us could see each other's faces. Mika had a desk in the room behind ours, and she sat near Mr. Dunn's office area (which was a large enclosed cubicle). I was more than eager to help with anything and everything, and routinely offered my help, but most times they would say no. I cleaned the kitchen when Mr. Moses did not want to; I helped configure people's computers, I helped loading stuff in the van, protecting the van's removed seats, helped with the van's repair and maintenance, I organized file cabinets, I labeled cables, I helped with insect control problems, I found building problems with leaking water mains and reported it for official repair, I fixed the broken toilet seat in the men's room, I fixed the broken toilet paper holder in the men's room stall, I helped diagnose the broken central air conditioner, and much more.

51) I would always indicate where I was going when I left the office. Most often, I put a yellow post it note on my computer monitor, or sometimes I would say so verbally instead. But when I would say it, usually, no one would respond. Instead they would just look at me with a blank expression, and rarely ever acknowledge what I said. Conversely though, others would often just get up and leave the office without saying anything at all or leaving a note.

52) I don't know of anyone else on our team who had a disability, and/or anyone who arrived late because of a disability. But Chris Moses was allowed to come and go as he pleased. He does not appear to have any disability, aside from the fact that he has a mild / moderate speech impediment (i.e. he stutters). But I do not believe this has any impact on the hours he works, or that his playing golf helps his speech impediment. He would often leave the office to play golf, at all times and hours (primarily early and mid afternoons). I don't know if he used any of his accrued leave when he left the office to play golf. I don't believe management had any issue with him.

53) During my employment, nobody ever asked to see any documentation of my medical condition. Nobody had ever requesting any supporting documentation regarding my medical condition until after my termination (i.e. until requested by Mr. Dave LaGrow during the initial EEPOC phase). And then as soon as it was requested, I immediately provided documentation of my sleep disorder to the EEO office.

Favoritism

54) Mr. Dunn plays favorites – his favorites are/were Mika Beard, and Jessica Weaver, the latter of whom had abruptly quit on her own, just a few days prior to my termination and after she had promised otherwise to Mr. Dunn just a few months earlier. Somewhere in the middle of his favorites list are coworkers Mr. Moses and Ms. Stukes. But I was obviously last and least on his list, and it is obvious that he did not consider me a part of his team, and never really had. When I mentioned to Mr. Dunn about the birthday situation, he told me I was making a big deal out of nothing. I disagree. When every other employee is considered important enough to celebrate their birthdays, but for mine, I don't even get as much as being told "happy birthday", that proves there is a huge disparity in how I was viewed and regarded in relation to everyone else.

55) I had subsequently complained of this disparate treatment to: 1) Mr. W. T. Little, who I attempted to speak to in person several times, but eventually only spoke to him over the phone; 2) Major Randolph, where we eventually spoke over the phone; 3) I also attempted to speak to Col Hodges, but only was able to speak to his secretary; 4) The base legal office (in person), whom politely told me that they weren't allowed to discuss anything with me; 4) TSgt. Collins, the EEO officer, in person, over the phone, and via email; and 6) David LaGrow, EEO office, via phone and email.

56) All throughout my employment, I had performed excellent work. I not only built an entire new website exactly as they described, but I also managed to keep the existing Word Press website maintained. But despite all of this, it was obvious that I was treated disparately by Mr. Dunn and all of my coworkers. It was unmistakable that they all were friendly with each other, and they consider each other part of the team, but I was never really a part of that team. Nobody ever spoke to me unless they absolutely had to. In fact, one coworker would never even address me by my first name, and more. For example, for every other coworker, the marketing team celebrated their birthdays by talking them out to lunch, buying them a card, buying them a gift, and making them a cake. In fact, one new employee, Jessica Weaver, had only been here for about 2 weeks, and for her birthday, they not only did all of the above, but further they hung up banners and streamers all around her desk. Yet for my birthday, nobody even said "Hey Steve happy birthday", let alone buy me a card, let alone make a cake, let alone take me out to lunch, let alone buy me a gift.

57) And on top of all that, Mika Beard, the second in command, was rude and disrespectful to me on more than one occasion.

58) For example, on or about August 27, 2013, someone named Troy (from another department on base) came by to the marketing department office, seeking information and assistance about the "AMC icon "event. He wanted to speak with Mika, but she was on the phone. So while she was on the phone, we spoke. He was the sound guy for an "American Idol" type contest at the base, and he wanted to videotape the contestants.

59) He wanted to recreate the winner's performance and have it video-taped, to then submit it to the AMC command to have it judged and hopefully make the finals. As this man (whom I later would learn was named "Troy"), was a soundman, and I am a musician and recording engineer with video editing experience, we discussed the technical details of his equipment and how it could be done to maximize the recording quality.

60) A short while later, Mika got off the phone and he and Mika spoke. Listening to their discussion, I tried rolled my chair a few feet over and tried to make some helpful suggestions. But Mika, very rudely and embarrassingly, extending her arm and pointing her finger, said to me "Hey, go back in there and do your job! Nobody was talking to you, this doesn't concern you!". Since I am both a musician and an electronics engineer, I was helping them both by giving my knowledgeable suggestions and expertise as to how best accomplish this, but Mika Beard (who is neither a musician or electronics engineer) rudely humiliated me in front of him. But although I was humiliated, I tried to smooth over the awkwardness by telling Ms. Beard that I was just trying to help; and that I was just trying to share with them my skills and knowledge as both a musician and an engineer, with the sole purpose trying to be helpful to help them achieve the best possible audio quality for the video recording. But she still angrily and awkwardly chastised me further (as if I was child), and she again told me to go back to my desk, still pointing her finger.

61) Mika was present during my initial interview, and she knew I was desperate for a job because of my disability. Mika Beard has no respect for me, but for the other employees who shared the office with me (i.e. who were Chris Moses, Jodie Stukes and Jessica Weaver), I never heard Ms. Beard talk to them even remotely in the same disrespectful and humiliating manner that she spoke to me in. If anyone else had tried to make a helpful suggestion, she would not have spoken to them that way at all. But with me, because she has such disrespect for me, she didn't think twice about humiliating me in front of other people. And that comes from the disrespect that Mr. Dunn has for me, because he knows my sleep disorder makes me desperate for a job, and he is a marketing guy with little knowledge or appreciation of technical details, so he does not truly appreciate my level or skill and knowledge, and thus disrespects what he is incapable of understanding. And it seems that they all resent me because I cannot get into work before 10:00 AM.

CHEATED OUT OF PAY (and accrued leave)

62) Mr. Dunn took a scheduled 2-week vacation at the end of August. (His last of work before the vacation was Friday Aug 16th, which was the close of a pay period. His first day back from vacation was Tuesday Sep 3rd).

63) On Friday Aug 16th, he let everyone out a few hours early on admin leave. But I stayed behind and continued to work until 7:30 PM, as I told him I wanted to put in a few extra hours to make up for any difference during the pay period. Finally around 7:30PM I was ready to leave, and Mr. Dunn was still working in his office. I went and said goodnight and wished him a happy vacation, and jokingly said "See you in September, as the song goes". He said ok, and he did not say anything to me that I still needed some additional hours or else my pay would be short changed.

64) So when I checked my pay the following Friday, Aug 23rd, I was shocked that I was only paid 72.75 hours at regular pay, and another 2.75 hours at "3rd shift rate", which was only a total of $4.95 (i.e. $1.80 per hour)! I went over and spoke to the personnel office, and I even suggested maybe we should try to contact Mr. Dunn at home to see if he knows anything about it. The personnel rep, named Michelle, said she didn't want to bother anyone while on vacation, and put in a correction for me, which came out to about $98. I then went over to the NAF accounting office and was paid that amount in cash.

65) The following week, I was out on Monday Aug 26th on sick leave (8 hours). Tuesday thru Thursday was unremarkable, but on Friday Aug 30th, I arrived for work at just after 12:00 noon. I worked for an hour, at which time Mika Beard then came in and told me to go home, that I was not going to be paid anything for the day. I was quite upset, as I had already worked for an hour, and it takes me nearly an hour each way from my house, and it costs me almost $20 in gas each day. (I was driving a 2001 Chevy Tracker which gets horrible gas mileage). So since they were refusing to pay me anything for the day, even the 1 hour I had already worked, I went home as instructed.

66) On Tuesday Sep 3rd, Mr. Dunn was back from his vacation, and I waited until the end of the day after everybody else went home before speaking with him. When I approached him, I was expecting him to tell me that both the Friday Aug 30th situation and the shortage for the previous pay period were both mistakes. But to my surprise, he then went on the offensive with me and said that neither was a mistake! He said he intentionally paid me less the prior pay period, and that he told Mika to tell me to go home on Friday Aug 30th! I was shocked at his sudden change, and asked him if he had known I was going to be paid less on the Aug 16th pay period, why didn't he tell me that before he left, or asked me to put in a leave slip to cover any remaining shortage. But he denied that he had any responsibility to do so and said I should have known that all on my own. Then when I mentioned how Mika embarrassed me and how she spoke to me, instead of saying that Mika was wrong for doing so, he basically said I should have minded my own business. So he basically said I was wrong and she was right for talking to me that way. At the very least, he could have acknowledged the fact that the manner in which she spoke to me was inappropriate, but because she is his favorite, he did no such thing.

67) I told him I was under-utilized, that for over 90% of the day, I have nothing to do, and I realize that both he and Mika are putting in way more than 40 hours each, and I offered to help both or either of them. Monty said he didn't want my help, and that some of the stuff he does I cannot help him with. I asked that aside from managerial stuff that deals with personnel issues, what else was I unable to help him with. I reminded him I have a Bachelor of Science degree in Electronics Engineering, I am a very smart guy and I could learn any task or subtask within a very short period of time. But he said no to my offer. I then offered to help Mika with any of her tasks, as she had claimed that she works 78 hours each week on a regular basis. But he said no to that suggestion also. I reminded him that he met Mika many years ago working as a waitress in Pudgy's, and she had no formal knowledge or training at all, but yet he was able to teach her how to do everything what she does now, so there was no reason at all why I couldn't learn some pieces of what she does and help her. Then he told me he doesn't want me to help her – he trusts her with the financial stuff and doesn't want me involved in that. I asked about the other stuff she does, and he still said no. So basically, he said I have to sit there and do nothing for 8 hours each day, and not to offer my help to anyone unless they ask me for it. And then when we discussed lunch breaks, he said that even if I stay on base, lunch breaks are deducted from my time. I told him that it was not the policy when I worked at Fort Monmouth, which was if you stayed on base, your lunch breaks were counted as official time. I also told him that never before was I made aware that he was subtracting all lunch breaks from my accumulated time. Again, he responded that I should have known that on my own.

68) But even assuming the lunch breaks account for the 4.5 hour difference on the pay period ending on Aug 16th (i.e. I was credited for 72.75 hours plus 2.75 hours, equaling a total of 75.5 hours that pay period), that still would have been $81 gross, and about $61 after taxes. Not the $98 I was deducted. I also should have accumulated my full 4 hours sick leave and 4 hours annual leave for that pay period, but I did not.

69) On Friday Sep 6th, I checked my pay, and I saw that for the pay period ending Aug 30th, I was only paid for 18 hours of work and my 8 hours of sick leave, for a grand total of only 26 hours!! I was livid, and I waited for Mr. Dunn to get back to his office to speak with him. When I did, he was apathetic about it, and said to me, in a quite indifferent tone of voice, that he would look into it. He also told me that he deducted from the most recent paycheck the amount that was credited to me previously by Michele in the personnel office, and refused to pay me anything for Friday Aug 30th, not even the one hour that he intentionally let me work before telling Mika to tell me to go home. He then also said that I could no longer get in to work whenever I was able to, but did not give me any specific time which I now had to get in by.

The EEO Grievance

70) I then demanded that this be corrected immediately, and I told him that if this doesn't get fixed, I was going to file a formal grievance against both him and Mika. He then threw me out of his office. I then attempted to speak to Mr. Little, whom was out of his office picking someone up at the airport, then I tried speaking to the legal office, but was told that the attorneys would only speak to "walk-ins" on Tuesday mornings between 9:00 AM and 11:00 AM, and then I went over to personnel office and spoke with Megan. I told her of the issues with the hostile work environment and being short changed on my pay, and she told me it was wrong for Mr. Dunn to go back in and deduct from the current paycheck for the previous adjustment . I told her that I was skeptical of how seriously the grievance would be taken, as what happened when I did so at Fort Monmouth, they just swept it under the rug. But she assured me that this was the Air Force, things were different, and that it would be taken seriously.

71) I then went back to my desk, and I heard Mr. Dunn speaking to someone on the phone laughing. I heard him say "Sorry Michele, he thought he was underpaid, but he got paid for the hours he worked". And continuing in his laughing, I then heard him say: "Yeah I know, he is a real character". And then he said, still laughing, "Thank you so much Michelle". So that removed any doubt in my mind of how seriously this matter was going to be taken – once again, I have no doubt that this will be swept under the rug. But then I contacted the NJ Dept. of Labor, wage and hour division. I made sure that when I was speaking, it was loud enough so Mr. Dunn could hear. Then I heard him change his whole tone of voice, and a few minutes later, called me into his office and said I would get my pay. But when I went over to pick it up, it was still $200 short. (My gross pay is $1440 and my take home is normally $1085.10) And I also did not get the proper amount of accrued sick leave and annual leave for this pay period either. I should have a total accumulation of 44 hours annual leave, and 36 hours of sick leave (that is including the 8 hours used on Aug 26th). But instead, I then showed balances of 41.3 hours annual leave and 33.3 hours sick leave. Both were 2.7 hours short each. The Bottom Line to my underpayment was that I was (and still am) owed $200 in net pay (aside from 2.7 hours of sick leave and 2.7 hours of annual leave).

72) The intentional conspiracy to fire me in retaliation for my EEO grievance

73) I was fired on Thursday Sep 12th, and the EEO complaint I had filed the day before, on Wed Sep 11th.

74) Mr. Dunn and other management officials were aware that I was going over to the EEO office on Sep 10th and Sep 11th. Prior to that, I had even visited the base legal office and asked if they could step in and help settle this informally, thus avoiding the need for me to file my EEO complaint.

75) It appears that on Friday Sep 6, 2013, Mr. Dunn first shared with Mika Beard information of my intention to file an EEO complaint. Moreover, on Tuesday Sep 10th, she was walking back from Bldg. 2905 and she saw me driving over there, and since she knew that I had absolutely no other reason to go to that building, I am sure she realized that filing my EEO grievance was what I was doing there.

76) On Sep 9th and Sep 10th, I had spoken to several individuals in the NAF Human Resources office, including Michelle Little (apparently no relation to my supervisor Mr. W T Little), Megan Govin, and Sandy McKay (who is the head of the NAF personnel office. Yet even as Sep 10th, no one in the personnel office knew anything about Mr. Dunn's intent to terminate me prior to Sept 12th. Thus there can be little doubt that Mr. Dunn's actions to fire me were taken in direct response to my filing of the EEO complaint on Sep 11th.

77) It is interesting, although it seems most likely purely coincidental, that the very same day of my complaint to personnel, Col. Hodges emailed everyone a flyer on the 87th Air Base Wing Policy on Equal Opportunity and Treatment, forbidding discrimination and disrespectful conduct. And only a few days before that, a flyer on the NO FEAR Act had been disseminated to all base personnel.

78) I had also talked to several individuals at personnel, and they had no idea that I was being fired until they received Monty's paperwork on Sep 12th.

79) Mr. Dunn was talking to Michelle from personnel when I overheard him call me a "real character", and I heard him address Michelle by her first name. I told Mr. Dunn that I overheard him on the phone. He responded by asking me how did I know that he was talking about me when he said that. Since I had just been speaking with Michelle, and I had just left the Personnel Office about 2 minutes before I overheard his phone conversation with Michelle, it was obvious that he was talking about me. Moreover, the only other possible "he" that Mr. Dunn was responsible for was Chris Moses, as the other 3 marketing team members were all female. And I really don't believe he was referring to Mr. Moses.

80) On September 9, 2013, I could hear Mr. Dunn talking to someone on the phone, and I overheard Mr. Dunn telling that person about the "jerk off" he hired for the website (i.e. the job I was hired to do). I told him that I heard what he said over the phone about me being a jerkoff. His response was "You're forgetting who's in charge around here".

81) Even after my termination, several individuals at the NAF HR office were quite nasty and rude towards me, particularly Megan Govin, whom was really nasty towards me and refused to even provide me COBRA benefits, until I complained to an outside agency (who ranked above Govin) about Govin's refusals, whom then contacted Govin and told her she had to allow me to get COBRA benefits.

82) However to be fair, as I was being processed out, I got the impression that Sandy McKay felt bad for me, and that she knew that I had been wrongfully fired, but I guess she did not have enough weight to do anything about the conspiracy to fire me made between Mt. Dunn, Mr. Little and other individuals higher up the chain.

## Count 1 –WRONGFUL TERMINATIONS AND DISCRIMINATORY REFUSAL TO REHIRE

83) Plaintiff incorporates each and every allegation contained in paragraphs 1 – 81 hereof as though fully set forth at length herein

84) A critical factor in losing my job with the US Army in 2002, was the lack of a proper accommodation for my sleep disorder. The lack of a proper accommodation for my sleep disorder resulted in my being not officially approved for my later-than-average daily starting times. And the Army then used my later-than-average daily starting times as a basis to unfairly give me lower-than-deserved performance ratings, which subsequently were then used as a critical factor against me in my 2002 termination action.

85) Then in 2009, the US Army effectively used my sleep disorder again as the sole basis not to rehire me, after acknowledging that I had proved in a court of law that my 2002 termination was wrongful, and the only reason why that termination was sustained in 2002 was due to the negligence of my former attorney. This was a discriminatory refusal to hire.

86) And then throughout my 2013 employment with the US Air Force, again I was discriminated against because of my sleep disorder. That is, I was repeatedly disrespected and treated disparately, directly because of my sleep disorder; and then later, I was eventually terminated, indirectly because of my sleep disorder (i.e. in retaliation for filing the EEO grievance).

87) These were continuing wrongs of the prior wrongful acts of the US Army, as the wrongful conduct was continued again in 2013 during my employment at Joint Base McGuire Dix Lakehurst, where I provided services for all branches of the DoD (i.e. including the United States Army and the United States Navy, as well as of course for my direct employer, the United States Air Force). During this last DoD employment, my sleep disorder was used directly against me throughout my employment; and finally when I filed a formal EEO grievance because of the wrongful conduct, I was then fired in retaliation for filing the EEO grievance.

88) Moreover, the reasonable accommodation which had been in place for the previous 5 months for my sleep disorder, was changed arbitrarily and capriciously in late Aug 2013, and without any prior notice.

89) On Sep 12, 2103, immediately after I filed my formal EEO grievance, I was fired in direct retaliation for doing so.

90) In 1964, the United States Congress passed the Civil Rights Act, Title VII of which prohibited employment discrimination, and was codified as *42 U.S. Code § 2000e et. seq.* In 1973, the U S Congress passed the Rehabilitation Act, which prohibited employment discrimination against individuals with disabilities in the federal sector. In 1990, the US Congress passed the Americans with Disabilities Act (ADA), codified as *42 U.S. Code § 12101 et. seq.* The Rehabilitation Act was amended in 1992 to include the same standards as set forth in the ADA. In 2009, the United States Congress passed the Ledbetter Fair Pay Act, which extended the protections under Title VII of the Civil Rights Act to include disabled employees as defined in the ADA.

91) *42 U.S.C. § 12102* establishes that my sleep disorder is a disability. *42 U.S. C. § 12102 (1)* provides: The term "disability" means, with respect to an individual - (A) a physical or mental impairment that substantially limits one or more **major life activities** of such individual. *42 U.S. C. § 12102 (2) (A)* provides: In general. For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, **sleeping**, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. [emphasis added]

92) *42 U.S.C. § 12111* establishes that the Dept. of Defense, the US Army, and the US Air Force, needed to provide me with a reasonable accommodation for my sleep disorder, which they all repeatedly failed to do.

93) *42 U.S.C. § 12112* establishes that the above-described actions of the DoD, the United States Army and the Untied States Air Force (and the employees thereof) were wrongful, and the facts of this case will show that these wrongful acts were all part of a long pattern of continuing employment violations.

94) The Notification and Federal Employee Antidiscrimination and Retaliation (No-FEAR) Act of 2002 was enacted to discourage federal managers and supervisors from engaging in unlawful discrimination and retaliation. However, in clear contravention of this Act, as well as what is codified in *42 U.S. Code § 12203*, I was wrongfully terminated for filing the formal EEO grievance.

95) By reason of the foregoing, plaintiff has been damaged.

96) WHEREFORE, plaintiff hereby demands judgment against defendants Heather Wilson, Secretary of the United States Air Force; The United States Air Force; Charles M. Dunn; Mika Beard; W.T. Little; The United States Department of Defense; and The United States Army; jointly, severally and in the alternative, for:
   a.   compensatory damages;
   b.   punitive damages;
   c.   consequential damages;
   d.   costs of suit and attorneys fees; and,
   e.   such other and further relief as the Court may deem just and proper.

## Count 2 - HOSTILE WORK ENVIRONMENT

97) Plaintiff incorporates each and every allegation contained in paragraphs 1 – 96 hereof as though fully set forth at length herein

98) Throughout my employment with the US Air Force, I was discriminated against because of my disability: my sleep disorder. In particular, I was repeatedly disrespected and treated disparately, both directly and indirectly, because of my sleep disorder.

99) My office coworkers all shunned me, and in Sep 2013, Mr. Dunn admitted that my coworkers did not respect me because I did not work the same hours as they did.

100) Moreover, the reasonable accommodation which had been in place for the previous 5 months for my sleep disorder was changed in late Aug 2013, arbitrarily and capriciously, and without any prior notice.

101) The act of Mr. Dunn and Michelle Little both laughing at me and calling me "a real character" was both offensive and hostile.

102) Worse still, Mika Beard's open disrespect and public humiliation of me was absolutely unacceptable. No person should be expected to work under such circumstances. Not only did it clearly create a hostile work environment, such conduct is in violation of multiple DoD policies. *For example, I recall that after the school shootings in the late 1990's, that twice a year all Fort Monmouth employees had to attend a "Consideration Of Others" training course (a.k.a. "CO2 training").*

103) And even when I directly brought the hostile work environment to Mr. Dunn's attention, he not only failed to take any remedial action for the harassment; but further, he seemed to condone it and infer that I needed to continue to endure it.

104) As the Court of Appeals, 3rd Circuit noted in *Walton v. Mental Health Assoc., 168 F. 3d 661 (1999)*:
   The Supreme Court has held that language in *Title VII* that is almost identical to the above language in the *ADA* creates
   a cause of action for a hostile work environment. See *Patterson v. McLean Credit Union, 491 U.S. 164, 180 ... (1989)*
   ... This framework indicates that a cause of action for harassment exists under the ADA.

105) By reason of the foregoing, plaintiff has been damaged.

106) WHEREFORE, plaintiff hereby demands judgment against defendants Heather Wilson, Secretary of the United States Air Force; The United States Air Force; Charles M. Dunn; Mika Beard; W.T. Little; The United States Department of Defense; and The United States Army; jointly, severally and in the alternative, for:
   a.   compensatory damages;
   b.   punitive damages;
   c.   consequential damages;
   d.   costs of suit and attorneys fees; and,
   e.   such other and further relief as the Court may deem just and proper.

## Count 3 – CIVIL CONSPIRACY

107) Plaintiff incorporates each and every allegation contained in paragraphs 1 – 106 hereof as though fully set forth at length herein.

108) Mr. Dunn, and his cohort Mike Beard, decided that I should be fired for raising my EEO concerns and threatening to file an EEO grievance about the gross disparate treatment I was made to constantly endure.

109) Then after Mr. Dunn retaliated to my EEO grievance by initiating with his removal action against me, several other individuals conspired with him to go along with, and later uphold, this wrongful and retaliatory termination of my employment.

110) In order to effectuate my removal, Mr. Dunn needed the aid of several individuals in the personnel office, including (but not limited to): Michelle Little, Megan Govin, and Sandy McKay.

111) After the removal was placed into effect, Mr. Dunn subsequently also needed the aid of other conspirators to uphold the wrongful termination. These individuals include (but are not limited to): W.T. Little, Major Randolph, Col. Hodges, and even the individuals in the local EEO office (i.e. Tsgt. Collins and Mr. LaGrow). And in order to continue to sustain my wrongful termination, Mr. Dunn also needed the aid of numerous other conspirators, including individuals from the 87th Air Base Wing all the way up to the top of the United States Air Force – namely, Heather Wilson, Secretary of the Air Force.

112) In New Jersey, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005)* (quoting *Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App.Div.1993)* ).

113) By reason of the foregoing, plaintiff has been damaged.

114) WHEREFORE, plaintiff hereby demands judgment against defendants Heather Wilson, Secretary of the United States Air Force; The United States Air Force; Charles M. Dunn; Mika Beard; W.T. Little; The United States Department of Defense; and The United States Army; jointly, severally and in the alternative, for:
   a. compensatory damages;
   b. punitive damages;
   c. consequential damages;
   d. costs of suit and attorneys fees; and,
   e. such other and further relief as the Court may deem just and proper.

## Count 4 – UNPAID WAGES

115) Plaintiff incorporates each and every allegation contained in paragraphs 1 –114 hereof as though fully set forth at length herein

116) To this date, I am still owed just over $200 in unpaid wages, plus 5.4 hours of unpaid leave (which at $18/hour, equates to an additional $ 97.20). Thus, I have been shortchanged approximately $300 (plus lost interest).

117) By reason of the foregoing, plaintiff has been damaged.

118) WHEREFORE, plaintiff hereby demands judgment against defendants Heather Wilson, Secretary of the United States Air Force; The United States Air Force; Charles M. Dunn; Mika Beard; W.T. Little; and The United States Department of Defense; jointly, severally and in the alternative, for:
   a. compensatory damages;
   b. punitive damages;
   c. consequential damages;
   d. costs of suit and attorneys fees; and,
   e. such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Pursuant to F.R.C.P. 38, Plaintiff hereby demands a trial by jury on all triable issues of fact raised herein.

### CERTIFICATION-THE MATTER IN CONTROVERSY IS NOT SUBJECT OF ANY OTHER ACTION

Pursuant to *Local R. 11.2*, it is hereby certified that, to the best of plaintiff's knowledge and belief, the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding. Further, other than the parties set forth in this pleading, at the present time plaintiff knows of no other parties that should be joined in this action.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____                        DATE: Jan 4, 2019
Steven D'Agostino, plaintiff pro se