# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| STEVEN D'AGOSTINO; | : | |
| | : | |
| Plaintiff, | : | Civil No. 19-281 (RBK/AMD) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| FRANK KENDALL[1]; | : | |
| | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

Plaintiff Steven D'Agostino brings this case pursuant to the Rehabilitation Act, Title VII, Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and common law. Plaintiff alleges that the U.S. Air Force, where he was employed as a Visual Information Specialist, unlawfully discriminated against him and terminated him on the basis of his sleep apnea disability. Presently before the Court is Defendant's Motion for Summary Judgment (Doc. No. 30) and Plaintiff's Cross Motion for Summary Judgment (Doc. No. 33). For the reasons detailed herein, Defendant's motion (Doc. No. 30) is **GRANTED in part** and **DENIED in part** and Plaintiff's motion (Doc. No. 33) is **DENIED**. Plaintiff's claims for retaliation and for unpaid wages still stand; for all other claims we grant summary judgment to Defendant. To the extent Plaintiff's letter (Doc. No. 36) constitutes a motion for leave to appeal an interlocutory order, that motion is **DENIED**.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), U.S. Air Force Secretary Kendall is automatically substituted as the proper party Defendant.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

*Plaintiff's sleep problems*

Plaintiff suffers from sleep problems related to his diagnosis of sleep apnea. (Deposition of Plaintiff Steven D'Agostino, Doc. No. 30-4 (Pl. Dep.) 27:20-26; Plaintiff's Counter Statement of Material Facts Not in Dispute, Doc. No. 33 ("Pl. St. Mat. Facts") ¶ 1; Defendant's Statement of Material Facts Not in Dispute, Doc. No. 30-2 ("Def. St. Mat. Facts") ¶ 2). Plaintiff was first diagnosed with obstructed breathing during sleep in 1992 or 1993, and some time after that Plaintiff was diagnosed with sleep apnea. (Amended Complaint, Doc. No. 8 ("Compl.") ¶ 33; Pl. Dep. 28:7-14). In 1995, Plaintiff had surgery to treat the obstructive sleep apnea and upper airway resistance. (Pl. Dep. 28:14-15). Additional sleep studies in 1997 and 2001 showed poor results. (*Id.* 29:22-25). Plaintiff did not pursue additional medical treatment after 2001 because he did not have health insurance. (*Id.* 29:21-22). Plaintiff has not consulted with any physician regarding his sleep apnea since 2002. (Def. St. Mat. Facts ¶ 5).

*Plaintiff begins working for the Air Force*

From March 2013 to September 2013, Plaintiff worked for the U.S. Air Force as a Visual Information Specialist in the marketing department on a probationary basis for a twelve-month period. (Def. St. Mat. Facts ¶¶ 12, 18; Termination Notice, Doc. No. 30-5 at DAG 48). When Plaintiff interviewed for the position in February 2013, he told his interviewers that he had a sleep disorder, and he requested a flexible start time. (Def. St. Mat. Facts ¶¶ 7, 8; Pl. Dep. 33:1-20). Plaintiff's initial accommodation request was to start working at noon. (Def. St. Mat. Facts ¶ 8). When Defendant extended the job offer, the supervisor asked that Plaintiff come in for work by 10:00 a.m. and remain until 7:00 p.m. (*Id.* ¶ 10; Pl. Dep. 34:4-10). The employer did not request

any medical documentation for the sleep apnea, and Plaintiff did not proffer any while working there. (*Id.* ¶ 15; Pl. Dep. 34:19-24). In Plaintiff's "Statement of Physical Ability" form, Plaintiff indicated no physical limitations to perform his job. (Statement of Physical Limitations, Doc. No. 30-5 at DAG143). Plaintiff concedes that he was late "a few times" even with the 10:00 AM accommodation. (Compl. ¶ 42). The parties dispute the nature of the start time accommodation. Defendant maintains that the accommodation was always a 10:00 AM start time, whereas Plaintiff maintains that at some point during his employment he was permitted to come and go as he pleased so long as he got his hours in. (Pl. St. Mat. Facts ¶¶ 19-20; *see also* Pl. Dep. 39:18-25 ("[I]t doesn't matter if you show up at 2:00 o'clock in the afternoon, but you have got to stay until 10:00 o'clock at night if you're going to get paid for eight hours.")).

Plaintiff describes the work environment as hostile to him, despite his efforts to be polite and to lend a hand. (Pl. St. Mat. Facts ¶ 27). The supervisor "play[ed] favorites" and Plaintiff was "last and least on his list." (Compl. ¶ 52). His supervisor, during a phone conversation with someone else, referred to someone being "a character." Plaintiff believes this was in reference to him and takes offense to being called "a character" by his supervisor. (Pl. St. Mat. Facts ¶¶ 30-32; Pl. Dep. 55:2-17). The supervisor does not recall this incident. (Dunn Declaration, Doc. No. 30-8 ("Dunn Decl.") at DAG 183). Plaintiff felt that his supervisor and coworkers were usually civil but not warm and friendly with Plaintiff. (Pl. St. Mat. Facts ¶ 29). Other coworkers received a card and lunch on their birthdays, but Plaintiff received nothing – not even an acknowledgement of his birthday. (*Id*. ¶ 42). Plaintiff did not have enough work responsibilities to fill his day. (*Id*. ¶ 27).

There was an incident on August 27, 2013 when Plaintiff felt "humiliated" by a coworker in front of a visitor, who was a base employee from another department. (Pl. St. Mat. Facts ¶ 15). While the visitor spoke with a marketing department coworker about a videotaped singing event,

Plaintiff overheard them, approached them, and made suggestions. (*Id.* ¶ 42). Plaintiff avers that his coworker extended her arm, pointed her finger, and stated, "Hey, go back in there and do your job! Nobody was talking to you, this doesn't concern you!" (*Id.*). Plaintiff, feeling humiliated, told them that he was just trying to help based on his skills as a musician and engineer; in response, the coworker chastised him further. (*Id.*). When Plaintiff reported this particular incident to his supervisor, his supervisor told Plaintiff that Plaintiff should mind his own business when other coworkers are having discussions. (*Id.*). Defendant does not dispute Plaintiff's account of the incident. (Def. St. Mat. Facts ¶¶ 42-45).

Plaintiff felt that he received disparate treatment from management. He saw another coworker come and go during the day to play golf, and management did not appear to have an issue with that person. (Pl. Dep. 104:5-21). However, when Plaintiff sought accommodations for different start and end times to his day, he felt that management resented him. (*Id.* 104:21-105:2).

*Plaintiff and Defendant dispute hours worked*

For the pay period ending August 23, 2013, Plaintiff's paycheck was short $98 based on if he had worked a forty-hour work week. (Def. St. Mat. Facts ¶¶ 46-51; Pl. St. Mat. Facts ¶ 50). Plaintiff notified the personnel office, which put in a correction, and Plaintiff was paid $98 in cash. (Def. St. Mat. Facts ¶¶ 46-51; Pl. St. Mat. Facts ¶ 51). The supervisor later undid the correction, docking $98 from the subsequent paycheck. (Pl. Dep. 41:2-25; 61:16-24).

There is a factual dispute as to when Plaintiff began work on August 30, 2013 and whether his start time constituted tardiness. Plaintiff says that he arrived at work 12:20 to 12:30 PM, (*Id.* 84:23-24), and in any event, an afternoon start time would have been permissible under his agreement with his employer. (Plaintiff's Responses to Defendant's Statement of Material Facts, Doc. No. 33 ("Pl. Resp. Mat. Facts") ¶ 59). Defendants aver that Plaintiff was late to work, arriving

after 1PM. (Def. St. Mat. Facts ¶ 59). On that day, Plaintiff was declared Absent Without Leave and sent home without pay. (*Id*.; Pl. Dep. 85:9-16). Plaintiff denies that this occurred in his response, (Pl. Resp. Mat. Facts ¶ 59), but his Complaint does state that he was sent home on August 30 without pay, (Compl. ¶ 63), and in his deposition he also states that he was told to leave without pay. (Pl. Dep. 85:9-16).

On September 3, 2013, Plaintiff met with his supervisor to discuss the change in pay and the August 30 incident of being sent home. (Pl. Dep. 41:18-25). Plaintiff surreptitiously recorded the meeting but did not produce the recording in discovery. (*See, e.g.*, Defendant's Response to Plaintiff's Supplemental Statement Regarding Material Facts Not in Dispute ("Def. Resp. Mat. Facts"), Doc. No. 38-1 ¶ 20). The supervisor told Plaintiff that his pay had been docked for his lunch breaks, and that Plaintiff was not entitled to the $98 correction. (Pl. Dep. 41:2-25; 61:16-24). Plaintiff learned that his hours worked was an issue with management, and that he would only be paid for the hours that he worked. (*Id*. 62:7-14).

On Plaintiff's September 6, 2013 paycheck, Plaintiff had only been paid for twenty-six hours out of an eighty-hour pay period. (Pl. Dep. 52:1-5). Per Plaintiff's recollection, Plaintiff asked his supervisor about the deficit on the paycheck, and the supervisor was "very aloof." (*Id*. 52:6-9). Plaintiff told her supervisor that Plaintiff was "tired of being treated like crap. If my pay doesn't get fixed immediately, I'm going to file a formal grievance[.]" (*Id*. 52:11-16). The supervisor responded by stating: "Steve, we're done. Goodbye. Nobody threatens me ever. You're done. You're done. Go back to your office and do whatever you want to do. The best I can tell you is I'm going to look into it." (*Id*. 52:17-22).

After that conversation, Plaintiff went to the Human Resources office to discuss the disparate treatment and the pay disparity. (*Id*. 54:9-19). Plaintiff then returned to his desk where

he heard his supervisor laughing on the phone discussing the pay disparity with someone else. (*Id.* 55:1-5). Plaintiff then called the New Jersey Department of Labor and made a wage complaint loudly, so that the supervisor would overhear. (*Id.* 55:13-24). The supervisor told Plaintiff that his pay had been resolved. (*Id.* 56:3-7). Plaintiff confronted supervisor about talking about Plaintiff on the phone, which supervisor denied doing. (*Id.* 56:10-23).

*Plaintiff files grievance and is terminated*

On Tuesday, September 10, 2013, after unsuccessful attempts to discuss his situation with Human Resources and the base's legal counsel, Plaintiff spoke with the base EEO officer and started a formal grievance. (*Id.* 57:19-58:10). On Wednesday, September 11, 2013, Plaintiff signed the formal EEO grievance. (*Id.* 58:4-6). The following day, on September 12, Plaintiff was terminated; the stated reasons for the termination were for arriving late, for not working well with team members, and for complaining when asked to help. (Termination Notice, Doc. No. 30-5 at DAG 48). Plaintiff then proceeded with his EEOC complaint, which was dismissed on October 19, 2018. (Def. St. Mat. Facts ¶ 72; Compl. ¶ 31). Plaintiff then timely filed the instant matter.

Plaintiff had voiced his plan to file a grievance on September 6, 2013, and his supervisor sent an email requesting Plaintiff's termination that very afternoon. (Def. St. Mat. Facts ¶ 67). The parties dispute the order of events leading up to Plaintiff's termination. Plaintiff avers that the termination was not contemplated prior to Plaintiff announcing his plan to file a grievance. Plaintiff further avers that any evidence put forth by Defendant showing prior plans to terminate him is falsity, re-written to back-fill a nondiscriminatory, nonretaliatory reason for firing.

Defendant avers that Plaintiff's termination had been contemplated weeks prior to September 6, when the supervisor learned of Plaintiff's plan to file a grievance. In a sworn declaration, a Human Resources officer states: "Mr. Dunn notified my office at Human Resources

the first week of August 2013 for guidance in process of termination of a probationary employee. Mr. Dunn gave employee some more time to see an improvement and when that did not happen September 5, 2013 he determined the complainant would be terminated." (McKay Declaration, Doc. No. 30-10 at 5). Coworkers had made complaints against him stating that Plaintiff refused to help when asked, saying "it was not his job," at that Plaintiff failed to show up at a picnic after having agreed to come early to set up. (Dunn Decl. at DAG 172-DAG 173). Coworkers also complained that Plaintiff said "he was smarter than everyone else in the office and that he should be able to interrupt conversations because he knew what the conversations were about." (*Id.* at DAG 173). Plaintiff generally denies all facts in support of Defendant's argument that the termination was for legitimate, non-discriminatory reasons.

*Procedural history*

Plaintiff brought claims for violations of the Rehabilitation Act, Title VII, the Americans with Disabilities Act ("ADA"), and common law. (Doc. No. 1). Defendants made a motion to dismiss in part, and we granted that motion: dismissing a civil conspiracy claim and dismissing all defendants except the Air Force. (Doc. No. 9). Plaintiff then brought an amended complaint against the Secretary of the Air Force. (Compl.). Plaintiff filed a Motion for Partial Reconsideration on the dismissal, asserting that the individual defendants were acting outside of the scope of their employment per the Federal Tort Claims Act, and that there was a civil conspiracy. (Doc. No. 11). Seeing as Plaintiff did not bring a Federal Tort Claims Act claim, and disability discrimination is not remedied by civil conspiracy claims, we denied that Motion. (Doc. No. 18). Plaintiff's filings continue to make references to his prior employment with the United States Army, but because this matter does not contain claims against the Army, we will not address Plaintiff's allegations as they relate to the Army.

Each party made motions for summary judgment. (Docs. Nos. 21, 25). Because neither party complied with the proper procedure for filing and responding to summary judgment motions or deadlines, we terminated those motions and set out a new schedule for summary judgment papers. (Doc. No. 28). Defendant complied with the schedule, filing a motion for summary judgment on April 1, 2021. (Doc. No. 30). Plaintiff missed the deadline, filing his cross motion for summary judgment on April 15. (Doc. No. 33). Given Plaintiff's late filing, we extended Defendant's time to file opposition and reply papers. (Doc. No. 35).

Plaintiff then filed a letter (Doc. No. 36) requesting for this Court to allow interlocutory review of our March 25 order (Doc. No. 28) that had terminated the initial, non-compliant summary judgment motions and denied Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment. We fail to see what purpose interlocutory review might serve, seeing as we already denied Defendant's first Motion for Summary Judgment, both parties have since filed new motions for summary judgment, and we are ruling on those motions presently. The Third Circuit's review of the March 25 order would not change the course of this matter. To the extent Plaintiff's letter constitutes a motion for leave to appeal, that motion is denied.

Before us now are each party's motions for summary judgment. (Docs. Nos. 30, 33).

## II.  LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id.* at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    EVIDENTIARY DISPUTES

### A.  Video recordings that were not produced

Plaintiff's summary judgment papers contain references to video recordings and transcripts that were not produced in discovery. Discovery closed on June 12, 2020. (Doc. No. 16). The discovery rules contemplate disclosure by all parties of the evidence they intend to use so that the other side can adequately prepare for trial. Per Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Rule 26(a) and (e) set out required and supplemental disclosures, including "a copy—or a description by category and location—of all

documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii).

Plaintiff argues that Defendant should have asked for the recordings, as Defendant was on notice of their existence. But Defendant does not seek to rely on the recordings, so Defendant is not obligated to produce them. It is Plaintiff, not Defendant, who purports to rely on them in his motion for summary judgment; the onus was on Plaintiff to produce any and all evidence that is part of his motion. Plaintiff correctly acknowledges that because the video recordings and transcripts were not produced, they may be used only for impeachment. (Doc. No. 40 at 7). Impeachment of a witness takes place at trial, not during summary judgment. *See* Fed. R. Evid. Rules 607, 608, and 609. Plaintiff cannot use video recordings and transcripts that he had in his possession but did not produce to support his own claims in his motion for summary judgment. *See* Fed. R. Civ. P. Rule 37(c). For this reason, we rely on Plaintiff's deposition testimony, not on the video recordings, to recount the meetings on September 3 and September 6.

### B.  Defendant's unauthenticated evidence

In deciding a motion for summary judgment, the Court may only consider evidence which is admissible at trial. Fed. R. Civ. P. 56(e); *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995). At the summary judgment stage, evidence may be considered in a form which is inadmissible at trial, so long as the content of the evidence is admissible and the party offering the evidence can demonstrate that admissibility will be satisfied at trial. *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631 (E.D. Pa. 2004).

To be admissible at trial, evidence must be authenticated or identified. Fed. R. Evid. 901; *see also* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure

§ 2722 (2d ed. 1983) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)[.]"). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "[T]he burden of proof for authentication is slight…. there need only be a prima facie showing, to the court, of authenticity, not a full argument on admissibility." *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005) (internal citations omitted). "Documents can be authenticated by an affidavit of an individual with personal knowledge able to provide evidence 'sufficient to support a finding that the matter in question is what its proponent claims.'" *Cheng Keng Lin v. Teng Lin*, No. 10-4059 (RBK/KMW), 2013 WL 6858675, at *2 (D.N.J. Dec. 30, 2013) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)).

Plaintiff argues that Defendant relies on inadmissible evidence. Plaintiff states that the reports and memos proffered by Defendant are inadmissible because they were never transmitted to anyone prior to September 6, 2013, they were not signed, and they were not accompanied by certification by their authors. (Doc. No. 33 at 81). He further argues that they are not self-authenticating. (Doc. No. 40 at 5).

Defendant has not properly authenticated Exhibits 2, 3, or 4. Exhibit 2 contains excerpts from Plaintiff's personnel file. Exhibit 3 contains timekeeping and payroll records. Exhibit 4 contains weekly reports, incident memos, and documents concerning Plaintiff's termination. These materials are submitted without affidavit of an individual with personal knowledge of them supporting their authenticity. While the purported authors of these documents have submitted sworn declarations about other matters, the declarations do not reference the materials contained in Exhibits 2, 3, or 4. And while the Defendant's attorney has submitted a declaration that the

Exhibit are true and correct copies, the attorney does not have personal knowledge that the documents are true.

Defendant argues that these exhibits are self-authenticating because they were produced in response to a discovery request. As Plaintiff notes, however, the exhibits are outside the set of self-authenticating documents listed in Federal Rule of Evidence 902. Production in response to a discovery request is not a basis for self-authentication. *See* Fed. R. Evid. 902.

While these exhibits are not authenticated, there is no indication that they are falsified. It is possible that Defendant would authenticate them properly at trial. For now, we reach our decision without considering these exhibits.

### IV. DISCUSSION

#### A. ADA Discrimination Claim

The Rehabilitation Act, which applies the standards set forth in the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), to federal employers, "forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement." *Shiring v. Runyon*, 90 F.3d 827, 830-31 (3d Cir. 1996). The *McDonnell Douglas* burden-shifting analysis applies to claims of discrimination on the basis of disability. *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (applying the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to claims based on the Rehabilitation Act). First, a plaintiff bears the initial burden of making a *prima facie* showing of discrimination. *Id.* Upon a plaintiff's showing of a *prima facie* case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). Upon the defendant's showing of the

legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that defendant's proffered reasons are pretextual. *Id.*

### 1. Plaintiff's *prima facie* case

A plaintiff must first establish a *prima facie* case of discrimination by demonstrating that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citations omitted). A plaintiff qualifies as "disabled" under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). "[T]he definition of 'disability' should be construed 'in favor of broad coverage of individuals . . . to the maximum extent permitted.' Therefore, courts must interpret the term 'substantially limits' consistently with the liberalized purposes of the [2008 ADA Amendments]." *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015) (citing 42 U.S.C. § 12102(4)).

To make his *prima facie* case, Plaintiff argues that he qualifies as disabled under the ADA because of his sleep apnea and, in the alternative, because the Defendant regarded him as having that disability and discriminated based on that belief. Each is discussed in turn.

### *Actual disability*

Plaintiff asserts that his sleep disorder is a disability per 42 U.S.C. § 12102 because it substantially limits his major life activity of sleeping. *See* 42 U.S.C. § 12102(2)(A) (including sleep on an exemplary list of major life activities). A diagnosis alone, no matter how severe, is insufficient to establish a disability under the ADA. Rather, the disability inquiry is made case-by-

13

case. *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 513 n.5 (3d Cir. 2001). To determine whether a disability amounts to an impairment that substantially limits a major life activity per 42 U.S.C. § 12102(2), we look to (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact or the expected permanent or long-term impact of or resulting from the impairment. *Emory v. AstraZeneca Pharms. LP*, 401 F.3d 174, 180 (3d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)).

The burden of showing a disability based on sleep problems is quite high. *See Sloan v. City of Pittsburgh*, 110 Fed. App'x 207, 212 (3d Cir. 2004) (stating that a plaintiff alleging sleep impairment must show a "uniquely severe affliction," given that "[d]ifficulty sleeping is a common problem"). Other district courts in the Third Circuit have considered whether sleep apnea is an impairment that substantially limits a major life activity. In *Keyes v. Catholic Charities of Archdiocese of Phila.*, a nurse with sleeping problems brought ADA claims against his former employer. No. 09-cv-1887, 2010 WL 290513, at *1 (E.D. Pa. Jan. 20, 2010), *aff'd*, 415 F. App'x 405 (3d Cir. 2011). He had difficulty sleeping and began arriving at work late consistently. *Id*. He sought medical care including consultation with an ear, nose, and throat specialist, who recommended a sleep study. *Id.* at *2-3. He was eventually diagnosed with sleep apnea and prescribed a CPAP machine after he was terminated. *Id.* The district court dismissed the plaintiff's claims, finding *inter alia* that he was not able to establish a *prima facie* case of disability discrimination. *Id.* The plaintiff had reported having "no energy," which was "not sufficient to establish that [he] was substantially limited in his ability to work." *Id.*

*Ramage v. Rescot Sys. Grp.* involved an employee claiming disability discrimination on account of her brain tumor who reported impairment of the major life activities of sleeping, thinking, and seeing.  834 F. Supp. 2d 309, 320-22 (E.D. Pa. 2011). For sleep problems, she offered

14

as evidence a doctor's report stating her headaches often awaken her at night. *Id.* at 322. This was not enough evidence, in that court's view, for any reasonable jury to conclude that sleeping was substantially limited. *Id. Smyth v. Wawa, Inc.* had a similar analysis and outcome: the employee offered as evidence of sleep problems three brief notes from doctors mentioning trouble sleeping. No. 06-cv-4474, 2008 WL 741036, at *13 (E.D. Pa. Mar. 19, 2008). This evidence "[fell] short of showing, or even suggesting, the kind of severe affliction that might qualify plaintiff as disabled under the ADA[,]" so "plaintiff has not raised a genuine issue of material fact regarding whether she was disabled due to her difficulties sleeping." *Id.*

In *Peter v. Lincoln Tech. Inst.*, the district court considered whether an employee's sleep apnea imposed a substantial limitation. 255 F. Supp. 2d 417, 433 (E.D. Pa. 2002). There, the employee offered medical evidence contemporaneous to the employment period at issue. *Id.* She reported waking up five to six times a night, falling asleep throughout the day, and exhausting several unsuccessful medical interventions including a CPAT machine, tonsil/adenoid surgery, and pure-oxygen therapy. *Id.* at 434. This evidence of sleep problems presented enough of a factual issue to preclude summary judgment. *Id.*

Here, Plaintiff testified that he has sleep apnea and upper airway resistance, causing difficulty falling asleep. (Pl. Dep. 27:20-25). He was diagnosed with sleep apnea in 1992 and had surgery in 1995 that was unsuccessful. (*Id.* 28:7-16). He underwent three separate sleep studies between 1995 and 2001 showing "terrible" results. (*Id.* 29:23-25). He was subsequently diagnosed with sleep disorder in 2002 and was recommended for additional testing. (*Id.* 28-22:24, 30:4-10). He did not complete additional testing on account of being terminated from his job and losing his health insurance. (*Id.* 30:21-25). Plaintiff's sleeping problems affect his life activities because he is always tired, and he has a hard time doing tasks early in the morning. (*Id.* 31:21-32:8). Plaintiff

described his sleeping problems as "much more severe (i.e. 'quite a bit more severe') than most other people's sleeping problems," noting that they make it dangerous for him to drive when not fully rested. (*Id.* 32:11-20; Pl. St. Mat. Facts ¶ 58). In 1997 Plaintiff tried a CPAP machine, which did not help his condition. (*Id.* 37:6-15).

We find that Plaintiff has not offered enough evidence to suggest he has a disability under the ADA, even when taking the facts in the light most favorable to him. The medical evidence Plaintiff proffered is from ten years prior to the relevant period. To examine the nature and severity of the impairment, the impairment's duration, and its impact during the relevant time period, we only have his testimony. His own assertions about feeling tired do not suggest that his condition is severe enough to amount to a substantial impairment. The impact of his sleep problems on his waking hours are feeling tired and trying to avoid morning tasks; these are not substantial interruptions on his life while awake. Plaintiff has not proffered evidence to suggest that the major life activity of working was impaired; to the contrary, his evidence suggests he had no issues completing his work and that he sought out additional work on top of his duties. (*See* Opposition to Defendant's Summary Judgment Motion, Doc. No. 33 at 80). *Cf. Peter*, 255 F. Supp. 2d at 434 (finding that a disability was sufficiently alleged where plaintiff sought significant medical intervention for sleep problems and where sleep problems caused her to fall asleep in the middle of the workday, frequently interrupting her daytime hours).

### *Regarded as having a disability*

Even without a showing of an actual disability, a discrimination claim may still proceed based on an employer's perception of a disability and subsequent discrimination based on that perception. A plaintiff may be "regarded as" disabled if: (1) he has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as

constituting such impairment; (2) he has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) he has no such impairment but is treated by a covered entity as having a substantially limiting impairment. 29 C.F.R. § 1630.2(l). To be "regarded as" disabled, "the employer must regard the employee to be suffering from an impairment within the meaning of the statutes," *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002), that is, making "a mistake that leads the employer to think that the employee is substantially limited in a major life activity." *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192 (3d Cir. 1999).

To prevail in his "regarded as disabled" argument, Plaintiff must show that his employer misinterpreted information about his limitations to conclude that he was unable to perform a "wide range or class of jobs." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 757 (3d Cir. 2004). But Plaintiff has not alleged that Defendant regarded him as unable to do his job. Plaintiff's view that his supervisors and colleagues disliked him and resented him does not mean that he was regarded as unable to do the job. *See Keyes*, 415 F. App'x at 410 (stating that evidence of supervisors' negative attitudes toward plaintiff's sleep problems "in no way proves that his supervisors viewed him as unable to perform a wide range of work"). Because Plaintiff has proffered no evidence suggesting that his employer believed him to have a disability within the meaning of the ADA, he cannot meet the burden of showing he was "regarded as" disabled.

Plaintiff cites *Deane v. Pocono Medical Center* for the idea that summary judgment is not appropriate when a plaintiff has "adduced sufficient evidence to create a genuine issue of material fact" that the plaintiff was perceived as disabled. 142 F.3d 138, 140 (3d Cir. 1998). In *Deane*, a nurse sued her employer under the ADA as a "regarded as" plaintiff seeking an accommodation to limit heavy lifting. *Id.* The plaintiff put forth facts suggesting that the employer erroneously

perceived her wrist injury as substantially limiting the plaintiff's ability to work, which is a major life activity—that is, had the plaintiff's injury been as serious as the employer perceived it, such an injury would meet the statutory definition of disabled. *Id.* at 145. Given the facts in evidence suggesting employer's mistaken belief that the plaintiff was disabled, summary judgment was not appropriate. *Id. Deane* is distinct from the present matter because Plaintiff has proffered no facts suggesting that his employer believed his sleep problems to be more serious than they were, that is, serious enough to amount to a disability under the statute.

### 2. Defendant's reasons for termination

Notwithstanding Plaintiff's failure to establish a *prima facie* case, we will nevertheless assume a *prima facie* case and continue the *McDonnell Douglas* burden-shifting analysis by examining Defendant's reasons for Plaintiff's termination. Defendant proffers that Plaintiff was terminated because he was often late (beyond the 10:00 AM start time accommodation), quick to complain, and generally unreliable. We are satisfied that these are legitimate, nondiscriminatory reasons for termination. Even if at some point Plaintiff's accommodation changed from 10:00 AM start time to flexible work hours, the reasons besides lateness are legitimate, nondiscriminatory reasons for termination.

### 3. Whether Defendant's stated reason was pretextual

For the next step in the *McDonnell Douglas* analysis, we consider whether Defendant's stated reason for taking the adverse action was a pretext for discrimination. At this step, the Third Circuit provides two options for a plaintiff to overcome a summary judgment motion. Plaintiff must point to some evidence from which a factfinder could reasonably either (1) disbelieve the employer based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" or (2) believe that "an invidious discriminatory

reason was more likely than not a motivating or determinative cause of the employer's action." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

Under the first option, disbelieving the employer, Plaintiff must show that the employer's proffered reason is "so plainly wrong that it could not have been the employer's real reason." *Id.* at 648 (citing *Keller v. Orix Credit All., Inc.*, 140 F.3d 1101, 1109 (3d Cir. 1997)). The second option for showing pretext involves examining "the natural probative force of the evidence" to see if discrimination was behind the employer's decision to terminate. *Keller*, 140 F.3d at 1111. Plaintiff was getting to work after 10AM in August. Plaintiff was under the impression that he could come and go as he needed, but the only evidence Plaintiff proffered for such a flexible accommodation is his own testimony that on September 3, 2013 his supervisor said he could come and go. Based on the evidence, Plaintiff's accommodation appeared to be a 10AM start time, until September 3, 2013. The natural probative force of the evidence suggests that Plaintiff was tardy, even when factoring in his 10AM start time. (e.g., August 23). So, even if Plaintiff's sleep problems were a disability, he cannot meet his burden of showing pretext because he was tardy and unreliable. Plaintiff has not met his burden of showing that Defendant's proffered reasons are "plainly wrong" or that discrimination was lurking behind the termination decision. Defendant's motion for summary judgment is granted with respect to this claim.

**B.  ADA Failure to Accommodate Claim**

Plaintiff appears to bring a claim for failure to accommodate under the ADA. Employers must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless "the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). A "qualified

individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8).  The statutory definition of "disability" is the same as discussed above.

The employee carries the burden of informing the employer of the employee's disability and the needed accommodation. *Drozdowski v. Northland Lincoln Mercury*, 321 F. App'x 181, 185 (3d Cir. 2009). This may involve an interactive process to identify the employee's limitations and potential accommodations. *Hohider v. UPS*, 574 F.3d 169, 187 (3d Cir. 2009) (citing 26 C.F.R. § 1630.2(o)(3)). To show that the employer failed to interact, the employee must demonstrate "(1) the employer knew about the employee's disability, (2) the employee requested accommodations or assistance for his or her disability, (3) the employer did not make a good faith effort to assist the employee in seeking accommodations, and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999).

In the same way Plaintiff cannot state a *prima facie* case for having a disability, without a disability he cannot bring a claim for failure to accommodate. Even if Plaintiff's sleep problems amounted to a disability under the ADA, he cannot show that his employer failed to provide a reasonable accommodation. Plaintiff has not proffered evidence as to why a 10:00 AM start time would not be a reasonable accommodation for him. We grant summary judgment to Defendant with respect to this claim.

### C. Retaliation Claim

Retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting framework as the discrimination claim discussed above. *See Weston v. Pennsylvania*, 251 F.3d

20

420, 432 (3d Cir. 2001). Failure to establish a disability under the ADA does not preclude a claim for retaliation. *See Shellenberger v. Summit Bancorp*, 318 F.3d 183, 188 (3d Cir. 2003).

### 1.  Plaintiff's *prima facie* case

To establish a *prima facie* case of retaliation under the Rehabilitation Act, Plaintiff must show that (1) he engaged in protected activity; (2) he suffered a materially adverse action; and (3) there is a causal connection between the adverse action and the protected activity. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). Here, Defendant concedes that Plaintiff engaged in a protected activity when he began EEO counseling, and that Plaintiff's termination was a material adverse action.

While Defendant acknowledges that EEO counseling is a protected activity, Defendant does not concede that Plaintiff's statement to his supervisor of his plan to file a grievance is a protected activity. In order for an employee's conduct to constitute protected activity, the employee must put the employer on notice "that the employee's opposition was directed at prohibited conduct." *Braden v. Cty. of Washington*, 749 F. Supp. 2d 299, 305 (W.D. Pa. 2010); *see also Muldowney v. K-Mart Corp.*, No. 1:10-CV-2555, 2013 U.S. Dist. LEXIS 164502, at *23 (M.D. Pa. Sep. 24, 2013) (citing same).

Defendant cites *Davis v. City of Newark* to argue that threats to file a complaint based on something other than illegal discrimination are not protected. 417 F. App'x 201, 203 (3d Cir. 2011). In *Davis*, an employee made complaints about general working conditions and policies. *Id.* Her retaliation claim failed because her complaints did not implicate a civil rights violation by her employer. *Id.*

Here, Plaintiff told his supervisor about his plan to file a grievance immediately after a conversation regarding pay discrepancy, and three days after their prior conversation also related

to both pay and Plaintiff's accommodation to work flexible hours. A jury could construe Plaintiff's statement of his plan to file a grievance as related to Plaintiff's general issues with how his pay and accommodations were being handled. Indeed, Plaintiff states in his deposition that his grievance was related to the hostile work environment, an ADA claim. (Pl. Dep. 53:11-17). Moreover, because Plaintiff had already met with Human Resources to seek a correction on his paycheck; a jury could construe Plaintiff's use of the word "grievance" as putting the supervisor on notice of a discrimination or EEO "grievance" as opposed to merely a paycheck "correction."

Defendant next asserts that Plaintiff cannot show a causal connection between the adverse action and the protected activity. Defendant argues that because his employer had already begun the process to terminate Plaintiff before Plaintiff engaged in any protected activity, a causal connection cannot be shown. But planning to terminate an employee and then carrying out the termination are different things. Defendant cannot get around the fact that Plaintiff discussed his accommodation needs with his supervisor on September 3, voiced an intent to file a grievance on September 6, initiated an EEO complaint on September 10, and received notice of termination two days later. The Third Circuit has recognized that causation may be established by timing alone, when mere days pass between the employee's protected activity and the employer's adverse action. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that the decision to terminate employee two days after learning of EEO complaint raised inference of causation). In further evidentiary support of a causal connection is the supervisor's response to Plaintiff's mention of a grievance: "We're done… Nobody threatens me." *Cf. Shellenberger*, 318 F.3d at 189 (finding that a ten-day lapse between protected activity and adverse action, along with employer's comment that could be construed as a disapproval of accommodation requests, supported a *prima facie* case of retaliation).

### 2.   Defendant's reasons for termination

Upon Plaintiff's showing of a *prima facie* case, the burden shifts to Defendant to give a legitimate, nonretaliatory explanation for the adverse employment activity. As stated above, Defendant proffers that Plaintiff was terminated because he was often late (beyond the 10:00 AM start time accommodation), quick to complain, and generally unreliable. We are satisfied that these are legitimate, nonretaliatory reasons for termination.

### 3.   Whether Defendant's stated reason was pretextual

The burden then shifts to Plaintiff to show "that retaliatory animus played a role in the employer's decisionmaking process," with outcome-determinative effect. *Shellenberger*, 318 F.3d at 190 (citing *Krouse v. Amer. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997)). Here, Plaintiff has proffered evidence suggesting that he was terminated shortly after he raised the subject of an EEO grievance with his supervisor. He has also testified that he was willing to be helpful to his colleagues, which contradicts the Defendant's explanation that he was quick to complain and unreliable. Given the timing and these facts in dispute, reasonable jury could find that there was retaliatory animus behind the termination decision. Therefore, summary judgment on the retaliation claim is not appropriate.

### D.  Hostile Work Environment Claim

To establish a *prima facie* case of a hostile work environment, Plaintiff must show that: (1) he qualifies as having a disability under the ADA; (2) he experienced unwelcome harassment; (3) the harassment was based on the disability or accommodation request; (4) the harassment was severe or pervasive enough to alter the conditions of his employment and to create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to remediate. *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999).

To determine whether harassment is severe or pervasive enough to create an environment that is hostile or abusive, we look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).

Here, Plaintiff's hostile work environment claim fails because, as discussed above, he has not made a *prima facie* case for having a disability or being regarded as having a disability. *Cf. Cagnetti v. Juniper Vill. at Bensalem Operations*, No. 18-5121, 2020 U.S. Dist. LEXIS 126095, at *38 (E.D. Pa. July 17, 2020) (collecting cases where summary judgment of hostile work environment claim was granted in favor of employer because employee failed to show disability or "regarded as" having a disability). Even if Plaintiff were disabled, he has proffered no evidence to establish severe, pervasive harassment. Unpleasant conduct by colleagues, such as ignoring Plaintiff's birthday or refusing to include him in conversations, will not form a basis for a hostile work environment claim if the unpleasant conduct is unrelated to the disability or accommodation request. While Plaintiff suspects that his colleagues ignored him and treated him unkindly due his different work schedule, he has proffered no evidence connecting their treatment of him with his work schedule. Therefore, Defendant is entitled to summary judgment on this claim.

### E.  Wage Claim

Plaintiff seeks recompense for hours he purportedly worked without pay. The parties appear to agree that this claim falls under New Jersey state law. Under New Jersey state law, workers are owed wages for time worked. N.J. Stat. § 34:11-4.1, et seq. Plaintiff has testified under penalty of perjury that he is still short $200, even when accounting for hours that he missed. (Pl. Dep. 82:8-17). Defendant denies this, asserting that any alleged underpayment is from his unpaid lunch hours

and hours not worked. Plaintiff's own deposition testimony is evidence, creating a dispute of material fact as to whether his employer owes him $200. Therefore, summary judgment is not appropriate.

      **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is granted to Defendants with respect for the ADA discrimination claim, ADA failure to accommodate claim, and hostile work environment claim. Summary judgment is denied with respect to the ADA retaliation claim and the wage claim. Plaintiff's cross motion for summary judgment is **DENIED**. Plaintiff's request for leave to seek interlocutory review is **DENIED**. An order follows.


Dated: 10/18/2021                                /s/ Robert B. Kugler
                                                                  ROBERT B. KUGLER
                                                                  United States District Judge