IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| STEVEN D'AGOSTINO, | |
| Plaintiff, | Civil No. 19-281 (RBK/AMD) |
| v. | **OPINION** |
| FRANK KENDALL, SEC'Y OF THE AIR FORCE, | |
| Defendant. | |

**ROBERT B. KUGLER**, United States District Judge:

This action is an employment dispute between Plaintiff Steven D'Agostino and the Secretary of the U.S. Air Force.

The relevant procedural history is as follows. Plaintiff brought claims for violations of the Rehabilitation Act, Title VII, the Americans with Disabilities Act ("ADA"), unspecified wage and hour law, and common law. (Doc. No. 1). Defendants made a motion to dismiss in part, and we granted that motion: dismissing a civil conspiracy claim and dismissing all Defendants except the Air Force. (Doc. No. 9). Plaintiff's Operative Complaint against the Secretary of the Air Force mentions claims for disability discrimination, failure to accommodate, retaliation, hostile work environment, and unpaid wages. (Doc. No. 10). After discovery, both parties moved for summary judgment. (Docs. Nos. 30, 33). We granted summary judgment to Defendant for the ADA discrimination claim, failure to accommodate claim, and hostile work environment claim, finding that the sparse evidence of Plaintiff's sleep problems did not indicate an affliction severe enough to qualify him as disabled under the ADA. (Doc. No. 42).

After summary judgment, two claims remained: retaliation and unpaid wages. The parties disputed whether Plaintiff was entitled to a trial by jury. The Court determined that the retaliation claim, brought under the Rehabilitation Act, entitles Plaintiff to equitable relief only. 42 U.S.C. § 2000e-5(g)(1). The Court further determined that the unspecified unpaid wages claim is best understood as a contract claim for which the government waives its sovereign immunity under the Little Tucker Act. 28 U.S.C. § 1346(a)(2). Such a claim "shall be tried by the court without a jury[.]" 28 U.S.C. § 2402. Because neither claim permits a jury, the Court proceeded with a bench trial.

For the reasons set forth below, the Court finds that Plaintiff is not entitled to judgment on either claim. Consequently, the Court will enter judgment in favor of Defendants. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

**A. Findings of Fact**

*Hiring and Duties*

1. In February 2013, Plaintiff applied for the federal civilian position of Visual Information Specialist for the 87th Force Support Squadron, Marketing Department, at Joint Base McGuire Dix Lakehurst, New Jersey. Transcript of Bench Trial Vols. I and II ("Tr.") (Docs. Nos. 81, 82) at 8:8-14.

2. The 87th Force Support Squadron is a Non-Appropriated Fund Instrumentality ("NAFI"). A NAFI is "[a]n instrumentality of the Federal Government established to generate and administer nonappropriated-funds for programs and services contributing to the mental and physical well-being of Department of Defense personnel and their dependents." 32 C.F.R. § 756.2. NAFIs employ civilian employees. Tr. 8:23-25.

3. Plaintiff interviewed with Charles "Monty" Dunn, Marketing Director of the 87th Force Support Squadron (formerly a Supervisory Marketing Specialist), and Mika Beard, Assistant Director of Marketing (formerly a Marketing Assistant). Tr. 9:1-3.

4. In March 2013, Mr. Dunn selected Plaintiff for the position of Visual Information Specialist. Tr. 8:12-14.

5. Plaintiff requested a later start time than the core work hours for the position of 7:30 a.m. to 4:30 p.m. Tr. 9:15-20.

6. Acknowledging Plaintiff's request for a later start time than the usual 7:30 a.m., Mr. Dunn asked Plaintiff to begin work by 10:00 a.m. and remain until 7:00 p.m., thereby working a full 8-hour shift (with one hour off for lunch). Tr. 219:19-220:18.

7. Plaintiff was officially hired as of March 25, 2013. Tr. 8:12-14.

8. Plaintiff's first day in the office was April 1, 2013. Tr. 68:13-14.

9. NAF job expectations and requirements are set out in the position description and again verbalized during the indoctrination meeting between the supervisor and new hire via the NAF New Employee Checklist. Tr. 69:4-6; Defense Exhibit ("DE") 4, 19.

10. Plaintiff's orientation meeting took place on April 1, 2013, his first day in the office, and he underwent a week or two of training. Tr. 68:13-18. Plaintiff signed a document indicating that he had been briefed on the subjects identified on the checklist, which included work schedules, time and attendance cards, leave procedures, and lunch/break periods. Tr. 81:16-17; DE 2.

11. As the role was designed, the Visual Information Specialist was responsible for audio-visual content, shepherding of multimedia, and managing the website for the 87th Force

Support Squadron, as well as perform other related duties as assigned. Tr. 68:22-69:3; 73:19-21.

12. The duties and responsibilities, qualifications, and performance standards for the Visual Information Specialist position were listed in the NAF Position Guide. DE 4; DE 19.

13. The position paid an hourly wage and guaranteed 20 hours of work per week. Tr. 75:8-18.

14. The NAFI Notification of Personnel Action noted that Plaintiff was subject to a 12-month probationary period beginning on March 25, 2013. Tr. 75:5-7.

15. The Air Force Manual provides that, "[t]he probational period tests the employee's ability, suitability, and fitness for the job, as shown by actual job performance." DE 19, ¶ 4.6 at 60. "During this period, the employee's conduct and performance are observed, and he or she may be separated if conditions warrant." *Id*. "The NAF-HR processes a personnel action upon satisfactory completion of the probationary period." *Id*.

16. The Air Force Manual provides that "[a]n employee may be separated during probation if he or she fails to demonstrate that he or she possesses the skills or character traits necessary for satisfactory performance in the position." DE 19, ¶ 4.6.6 at 62.

17. The Air Force Manual does not entitle probationary employees to written warnings prior to termination. DE 19, ¶ 4.6.6.1 at 62.

18. The Visual Information Specialist position fell under Mr. Dunn's direct supervision. Tr. 9:1-3.

*The Office and Other Employees*

19. Within the office space configuration, Ms. Beard observed when Plaintiff came and went in the office. Tr. 82:6-12, 83:1-5.

20. Ms. Beard almost always arrived at the office before Plaintiff. There were some days where both Plaintiff and Ms. Beard left at the same time, or she left a little before Plaintiff. On some days, Ms. Beard arrived before Plaintiff and was still there after Plaintiff left for the day. Tr. 83:6-13.

21. Mr. Dunn also observed Plaintiff's arrival and departure times first-hand. Tr. 83:14-18.

*Job Attendance*

22. Plaintiff's supervisor, Mr. Dunn, credibly testified that Plaintiff's official hours were 10:00 a.m. to 7:00 p.m. 220:17-221:4.

23. Plaintiff did not consistently comply with the agreed-upon 10:00 a.m. start time. See, e.g., Tr. 93:25-94:8; DE 7; DE 16.

24. Plaintiff testified that other employees in the office came and went at their own discretion. Tr. 87:10-88:5.

25. Plaintiff, and other employees in the office, were not allowed to come and go as they pleased. Tr. 221:5-7.

26. The employees Plaintiff described who came and went as they pleased did not report to Plaintiff. Tr. 88:6-8.

27. Plaintiff did not see the timesheets of those employees and Plaintiff does not know whether those employees submitted leave requests. Tr. 88:9-15.

28. After Plaintiff had been working about a month, during May 2013, Mr. Dunn began to notice Plaintiff's pattern of late arrivals, early departures, and frequent absences from the office in the middle of Plaintiff's expected working hours and the office's core hours. Tr. 299:8-14.

29. Ms. Beard also noticed Plaintiff's tardiness around the same time, so she began tracking Plaintiff's arrival and departure times. Tr. 152:1-25.

30. Contemporaneous records document incidents of Plaintiff's late arrivals, early departures, and frequent absences from the office in the middle of Plaintiff's expected working hours and the office's core hours. See, e.g., DE 17.

31. Mr. Dunn wanted everyone in his office to succeed. Tr. 220:8-15.

32. On May 2, 2013, Mr. Dunn spoke to staff generally about the need to make sure the office has personnel present at all times during the core office hours. He asked staff members to communicate their intentions to leave before doing so. Tr. 229:24-25; Tr. 230:1-14; DE 17.

33. On May 3, 2013, Plaintiff left the office for the day with the website inoperable and without access. Tr. 230:15-22; DE 17.

34. On May 6, 2013, Mr. Dunn instructed Plaintiff that the website is important to the office's mission and that it cannot be left "down," for any extended period of time, including over the weekend. Tr. 230:23-25; Tr. 231:1-6; DE 17.

35. Mr. Dunn instructed Plaintiff to always ensure the website was up and running, and that he expected Plaintiff to make that a priority before leaving for the day. Tr. 230:23-25; Tr. 231:1-6; DE 17.

36. On June 6, 2013, Mr. Dunn counseled Plaintiff about his "responsibility to both arrive on time and work a full shift." Mr. Dunn also told Plaintiff that he needed to arrive at a set time and leave only after completing eight hours of work and a one-hour unpaid lunch break for a total of nine hours in-office time. Tr. 232:11-25; DE 17.

37. The 87th Force Support Squadron, Marketing Department, at Joint Base McGuire Dix Lakehurst, New Jersey has a government vehicle for its employees to use for official

authorized purposes. Staff members are not permitted to use the government vehicle to commute home unless they have authorization to do so. Tr. 221:25-222:13.

38. On June 14, 2013, Plaintiff took the government vehicle to commute home and without authorization to do so. Tr. 84:6-85:14; Tr. 221:24-222:5; DE 6.

39. Mr. Dunn counseled Plaintiff concerning his unauthorized use of the government vehicle. Tr. 221:24-222:5; DE 6.

40. Plaintiff acknowledged that he could have been fired for taking a government vehicle without authorization. Tr. 85:21-22.

41. In August 2013, Plaintiff's coworkers complained to Mr. Dunn that Plaintiff was abandoning the office without notice, even when he had promised to cover for others. Tr. 233:1-25; 234:1-4; 297:25-300:11; DE 17.

42. Before Plaintiff began working, office abandonment was not an issue. Tr. 233:23-234:4; 299:12-14; 300:6-11.

43. Mr. Dunn responded by reiterating the rules to the entire team and requiring employees to maintain timecards for their hours worked as of August 16, 2013. Tr. 233:1-234:4, 18-235:16; DE 17.

44. Despite these reminders, Plaintiff continued to have poor work attendance and did not submit timecards for the first two weeks that the policy was in effect. DE 17.

45. Plaintiff completed timecards for the weeks ending August 23, 2013 and August 30, 2013, which indicated that he was entitled to 8 hours of pay for each of those days, except for August 30, 2013. Tr. 90:22-92:12; DE 15.

46. On every day of the pay period ending August 30, 2013, except for August 30, 2013, Plaintiff indicated that he arrived at 10:00 am, and left at 6:00 pm, without taking any time for lunch. DE 15.

47. In reality, Plaintiff actually arrived later than 10:00 a.m. each day. *See, e.g.,* Tr. 92:13-93:3; DE 7.

48. Plaintiff indicated on his timecards that he did not take time for lunch on each of those days; he actually took time for lunch. Tr. 93:4-21; DE 7.

49. Plaintiff indicated on his timecards that he worked 8 hours for each of the days for the weeks ending August 23, 2013, and August 30, 2013, Plaintiff worked less than that amount. *See* DE 7.

50. Mr. Dunn went on annual leave beginning August 19, 2013, and returning on September 3, 2013. Mr. Dunn designated Ms. Beard to temporarily assume his duties, including the supervision of Plaintiff. Tr. 94:13-20; 234:23-235:2.

51. Prior to taking leave, Mr. Dunn had told HR he did not think Plaintiff would make it through the probationary time due to marginal work and terrible attendance. Tr. 237:11-20.

52. Ms. Beard kept detailed records regarding Plaintiff's job attendance and conduct during her time as acting supervisor. DE 8, 9, 10, and 11.

53. Ms. Beard's records indicate that Plaintiff consistently arrived later than 10:00 a.m. and left before completing a full 8-hour shift. DE 7; DE 16.

54. On August 22, 2013, Ms. Beard specifically requested Plaintiff to arrive by 9:30 a.m. for a special event, the "Family Fun Installation-Wide Picnic"; Plaintiff showed up late, arriving at 10:30 a.m. Tr. 94:21-25; Tr. 162:1-2; DE 5; DE 8; DE 9.

55. On August 30, 2013, Plaintiff arrived for work several hours after 10:00 a.m. with no advance notice or communication. Tr. 239:10-14; DE 12.

56. Ms. Beard consulted with Mr. Dunn as to how to respond to Plaintiff's late arrival, and Mr. Dunn instructed her that Plaintiff was considered absent without official leave ("AWOL") and should be sent home upon arrival. Tr. 240:9-13; DE 12.

57. Ms. Beard spoke with Plaintiff, and, in accordance with Mr. Dunn's instructions, sent him home for the day. Tr. 240:9-16; DE 12.

*Plaintiff's Interactions with Coworkers*

58. On August 22, 2013, there was a major event on the base called the "Family Fun Installation-Wide Picnic." DE 9.

59. Plaintiff was tasked with assisting the rest of the marketing team with this event. Tr. 162:8-18.

60. Ms. Beard was the supervisor of the event. Tr. 94:9-14; Tr. 158:3-18; Tr. 234:23-25.

61. Ms. Beard wrote a report shortly after the event concluded in which she described Plaintiff's conduct at the event. DE 9.

62. In the report, Ms. Beard notes that Plaintiff was late, reluctant to help, quick to complain, and generally unreliable at the event. DE 9.

63. Ms. Beard testified that there was nothing positive to note about Plaintiff's conduct in the report. Tr. 164:2-14.

64. Although she asked Plaintiff to gather customer surveys, Ms. Beard ultimately concluded that Plaintiff "didn't (doesn't) have the right attitude" to successfully interact with others. DE 9.

65. After the event, Ms. Beard "begg[ed] [Mr. Dunn] to remove [Plaintiff] from the Marketing Office as soon as possible" in the report dated August 23, 2013. DE 9.

66. Ms. Beard testified that Plaintiff avoided doing his work duties and was quick to complain, but he was eager to disrupt others working on matters outside of his duties that interested him personally. Tr. 167:4-168:6; 201:4-202:16.

*Plaintiff's Disputes over Timesheets and Hourly Compensation*

67. On August 23, 2013, Plaintiff received his biweekly paycheck for the hours he worked from August 4 through August 17. D3.

68. His total hours for the pay period were calculated as 75.50, instead of a full 80 hours. D22 at DAG 001212.

69. Additionally, 2.75 hours were paid at a lower rate of $1.80 per hour. D22 at DAG 001212.

70. Plaintiff went directly to Human Resources to request a correction and to request additional wages to be paid to him. Tr. 14:23-25; Tr. 15:1-4.

71. The Human Resources Officer complied with Plaintiff's request and issued him a check for his additional claimed wages, which included paying Plaintiff his usual $18 rate for the 2.75 hours. Tr. 15:5-6.

72. He was additionally given $98 on the basis that he claimed to have worked 80 hours, not 75.50. Tr. 15:5-6.

73. When Mr. Dunn returned from leave, he became aware of the check issued to Plaintiff by Human Resources. Tr. 309:7-19.

74. Mr. Dunn informed Human Resources that Plaintiff had *not* worked 80 hours and was *not* due the extra $98 he was given.

75. The log kept by Ms. Beard shows that Plaintiff worked fewer than 75.50 hours in the relevant pay period. DE 7, 16.

76. Human Resources therefore deducted the $98 from Plaintiff's next check. DE 22 at DAG 001213.

77. On September 3, 2013, Plaintiff confronted Mr. Dunn about his concern that he was being underpaid. Mr. Dunn again explained to Plaintiff that, as an hourly employee, Plaintiff would only be paid for the hours he worked. Mr. Dunn reminded Plaintiff to abide by his set arrival and departure times, to work a full 8-hour shift, and to check in so Mr. Dunn knew where he was. DE 14.

78. On September 6, 2013, Plaintiff received his paycheck for the hours worked on August 18-31. DE 22 at DAG 001213.

79. He was upset to find that money he believed he was owed had been deducted. Plaintiff's paystub reflected 0 hours worked during the week of August 18-24 and only 26 hours worked during the week of August 25-31. DE 21 at 21-22.

80. Because Plaintiff had not submitted a timesheet for August 18-24, he had been declared AWOL for that week in accordance with applicable payroll rules. DE 21 at 21.

81. Plaintiff had arrived to work after 1:00 p.m. on August 30, and he had been declared AWOL and sent home when he did finally arrive at work that day. Tr. 368:4-7; DE 5, 12.

82. Plaintiff had only worked 6 hours per day on August 27, 28, and 29. DE 21 at 23 (showing 8 hours of sick leave on 8/27/2013 and 6 hours of sick leave on 8/28/2013 and 8/29/2013).

83. 83. Mr. Dunn approved 40 hours' wages for the week of August 18 to 24 after plaintiff informed him that he believed he was underpaid for that period. DE 13.

11

84. Nonetheless, Ms. Beard's log indicated that Plaintiff had not worked full shifts or that he accumulated 40 hours during the week of August 18 to 24. DE 7, 16; Tr. 142:20-21.

85. Plaintiff's wages for the week of August 25 to 31 remained calculated at 26 hours. DE 21 at 23, DAG 001198; DE 22 at 11, DAG 001213.

*Other Events Preceding Plaintiff's Termination*

86. In the first week of August 2013, Mr. Dunn approached Ms. Sandra McKay, a Human Resources Officer, to seek guidance on terminating Plaintiff during his probationary period. Tr. 237:11-25; Tr. 335:21-24.

87. At the end of August 2013, while Mr. Dunn was on vacation, Ms. Beard recommended terminating Plaintiff's employment in a memo to Mr. Dunn. DE 9, DAG 000034.

88. Some time before September 3, 2013, Mr. Dunn decided to terminate Plaintiff's employment. Tr. 242: 2-4; Tr. 294:19-20.

89. On September 5, 2013, Mr. Dunn began drafting a document necessary for effectuating Plaintiff's termination of employment. Tr. 242:2-4; Tr. 294:19-20.

90. On September 6, 2013, Plaintiff had a conversation with Mr. Dunn. Plaintiff surreptitiously recorded part of this conversation. Tr. 32:17-18; Tr. 243:2-3.

91. In this conversation, which occurred after Plaintiff received his paycheck, Plaintiff believed that he had been underpaid. Tr. 35:14-19; Tr. 243:7.

92. As captured on Plaintiff's surreptitious recording of the conversation, Plaintiff raised his voice to Mr. Dunn and stated the following: stating "I worked for you—I worked the hours! You owe me the hours! I gotta get paid for them, okay? And if this doesn't get fixed, I'm going to file a formal grievance against you and against Mika. Because I'm tired of being

treated like crap! I'm tired of being the low man on the totem pole! You can't jerk me around with my damn hours here! This is what I was . . . ." Tr. 35:14-19.

93. During this encounter with Mr. Dunn, Plaintiff threatened to file an unspecified grievance regarding his pay issue. Tr. 35:16-17.

94. Mr. Dunn appears to say in the recording: "We're done. Goodbye. Go back to work or do whatever you want to do. We're done. Nobody threatens me; nobody threatens anybody on my staff, ever. We're done. We're done. I'll look into it; that's the best promise I'm going to give you. Other than that, we're done. We're done now." Tr. 35:22-25; Tr. 36:1-2.

95. Prior to September 2013, Mr. Dunn had never terminated one of his employees. Tr. 241:13-15.

96. Mr. Dunn emailed a formal request to terminate Plaintiff's employment to Human Resources on September 6, 2013. Tr. 244:15-19; DE 5, DAG 000695.

97. Plaintiff contacted the EEO Office and initiated an informal EEO complaint on September 10, 2013, naming Mr. Dunn and Ms. Beard as the responsible management officials. Tr. 22:23-25; Tr. 23:1-11.

98. On September 12, 2013, Plaintiff received a written memorandum, signed by Mr. Dunn, notifying Plaintiff of the termination during his probationary period.

99. The memorandum informed Plaintiff that his termination was effective the next day. Tr. 23:12-14; JE 2.

100.    The memorandum advising Plaintiff of his termination stated the following as reasons for Plaintiff's termination:

    a. On 30 August 2013 [Plaintiff] w[as] marked as AWOL, preferring to show up at 1339 instead of [his] 1000 scheduled time for work.

    b. On 22 August 2013 [Plaintiff] w[as] directed to a special duty assignment at the Installation Family Fun Fest. [Plaintiff] arrived one hour late.

    c. [Plaintiff] h[as] demonstrated a pattern of failing to notify any team member when arriving to work for the day, or leaving/returning from an appointment. [Mr. Dunn] instructed the entire staff to not abandon the office in our staff meetings on 5 May [20]13 and 2 August [20]13. This practice is unacceptable and [Plaintiff] must ensure [his] accountability at all times, however, [he] h[as] continued to disregard [Mr. Dunn's] instruction and [Plaintiff has] not informed a co-worker of [his] whereabouts during the work day.

    d. [Plaintiff] do[es] not work well w[i]th fellow team members; [Plaintiff] complain[s] if [he] is not asked to help and argue or resist when [he] [is]. JE 2.

101. Each of the four stated reasons for Plaintiff's termination is supported by evidence.

102. On August 30, 2013, Ms. Beard declared Plaintiff AWOL after he showed up at 1339, instead of his 1000 scheduled start time for work. DE 16.

103. On August 22, 2013, Plaintiff arrived one hour late to his special duty assignment at the Installation Family Fun Fest. DE 8; Tr. 162:1-3.

104. Despite Mr. Dunn's instructions to the staff in May and August 2013 to not abandon the office and to notify team members of their whereabouts and maintain accountability, Plaintiff continued to disregard these instructions. Tr. 233:1-25; 234:1-4; 297:25-300:11; DE 17.

105. Plaintiff was argumentative about assignments. Tr. 168:14-22.

106. During Plaintiff's probationary period, Plaintiff failed to demonstrate that he possessed the skills or character traits necessary for satisfactory performance in his position as a Visual Information Specialist for the 87th Force Support Squadron, Marketing Department, at Joint Base McGuire Dix Lakehurst. DE 5 at DAG 000694.

107. Plaintiff was not able to meet the performance standards of: completing work as assigned, establishing deadlines, performing work in a timely manner to the standards set for the objective, courtesy, professional appearance and demeanor, exercising tact and diplomacy when dealing with both internal and external customers and co-workers, dependability, and reliability. Tr. 226:25-227:10.

108. The memorandum signed by Mr. Dunn advising Plaintiff of this termination documented the reasons why Plaintiff failed to demonstrate, during his probationary period, that he possessed the skills or character traits necessary for satisfactory performance in his position. JE 2.

109. The reasons for Plaintiff's termination were legitimate, nondiscriminatory, and not retaliatory. DE 5.

110. Mr. Dunn decided to terminate Plaintiff's probationary employment prior to Plaintiff's announcement that he planned to file a grievance.

111. Any protected activity engaged in by Plaintiff under the Rehabilitation Act was unconnected to the decision to terminate his employment.

112. No evidence indicates that the legitimate non-retaliatory reasons for terminating Plaintiff's employment were a pretext for retaliation.

113. The Court finds Plaintiff's testimony is generally not credible.

*Plaintiff's Wage Loss Claim*

114. Plaintiff testified that he is owed $273.22 in back pay. Tr. 63:24-67:7.

115. Plaintiff had problems coming to work on time and staying for a full day, and his absence became more noticeable beginning in July 2013. Tr. 157:1-12.

116. Throughout July and August of 2013, Plaintiff frequently arrived late and left early, working short of his scheduled eight-hour days with an unpaid lunch break. DE 7.

117. Plaintiff did not put forth any evidence of hours when he was working without pay.

118. Plaintiff's testimony that he is owed $273.22 is not supported by evidence of unpaid hours worked and therefore is not credible.

119. Ms. Christie Ford, the current NAF Human Resources Officer, credibly testified that there was only one pay period where Plaintiff did not receive a full 80 hours of pay for a two-week pay period. Tr. 127:15-9; 143:4-9.

120. In that pay period where Plaintiff was not paid for a full 80 hours of pay for a two-week pay period, he was paid for 74 hours of work. Tr. 143:10-144:10.

121. Ms. Ford created a payroll record of Plaintiff. Tr. 133:20-135:3; DE 21.

122. Ms. Ford created a spreadsheet depicting Plaintiff's timesheets and earnings that was admitted into evidence at Defense Exhibit 22. Tr. 138:10-139:13; DE 22.

**B. Conclusions of Law**

1. Plaintiff proceeds to trial on a claim of retaliatory discharge under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq*. and a wage claim under the Little Tucker Act, 28 U.S.C. §§ 1346(a)(2).

*Retaliatory Discharge*

2. The Court has jurisdiction over this employment discrimination matter under 28 U.S.C. § 1331 and 29 U.S.C. § 791(f) (incorporating ADA retaliation standard, 42 U.S.C. § 12203(a)).

3. Plaintiff has the burden of proof under the Rehabilitation Act to demonstrate by a preponderance of the evidence that there is a "but-for" causal connection between the adverse employment action and the retaliatory animus. *See Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017).

4. In evaluating these claims, the Third Circuit has noted that "the timing of the alleged retaliatory action must be 'unusually suggestive' of a retaliatory motive before a causal link will be inferred." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

5. There also must be more than temporal proximity between the protected activity and the termination. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

6. The Third Circuit analyzes retaliation claims uses the *McDonnell Douglas* burden-shifting framework used in cases brought under the ADA, 42 U.S.C. §§ 12101, *et seq*, for Rehabilitation Act claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

7. Under this burden shifting framework, to establish a *prima facie* case of retaliation under the Rehabilitation Act, the Plaintiff must show that: (1) he engaged in protected activity; (2) he suffered a materially adverse action; and (3) there is a causal connection between the adverse action and the protected activity. *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

8. Under this burden-shifting approach, Plaintiff has the initial burden to make a *prima facie* showing of discrimination, and the burden then "shifts to the employer to articulate some

legitimate, nondiscriminatory reason for the employment action." *Wishkin*, 476 F.3d at 185 (citing *McDonnell Douglas*).

9. If there is enough evidence to find a *prima facie* case, the employer's burden is still fairly light as it only needs to articulate any legitimate reason for the employee's termination to meet its burden. *Shellenberger*, 318 F.3d at 189.

10. Further, even if there is a short amount of time between the plaintiff's protected conduct, the complaint, and the termination of the plaintiff, the plaintiff still has to prove sufficient evidence of retaliatory animus and that their employer knew about the plaintiff's discrimination complaint before their termination proceedings began. *See, e.g., Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Drwal v. Borough of W. View, Pa.*, 617 F. Supp. 2d 397, 422-23 (W.D. Pa. 2009) (finding that a police officer claiming ADA retaliation did not have enough evidence to prove that the police chief knew about the officer's discrimination complaint before the officer was terminated). Overall, there must be a causal link between the discriminatory conduct and the employee's job termination.

11. The Third Circuit applies the "but for" causation test under Title VII retaliation cases where the statutory framework uses the term "because." *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). As such, the appropriate burden of proof for the causal connection is the "but for" causation test.

12. Plaintiff has not met his burden of establishing, by a preponderance of the evidence, a *prima facie* case of prohibited retaliation under the Rehabilitation Act.

13. Mr. Dunn began the process of terminating Plaintiff in early August (Tr. 237:11-25; Tr. 335:21-24) and Mr. Dunn's supervisor inquired in August whether the supervisor's assistance was necessary in removing Plaintiff (DE 10 at DAG 000037), which pre-dated Plaintiff's filing of an EEOC complaint.

14. Plaintiff has not met his burden of establishing, by a preponderance of the evidence, that his notice of intent to file a grievance was the but-for cause of his termination.

15. Plaintiff has not met his burden of establishing, by a preponderance of the evidence, that Defendant's legitimate non-retaliatory reasons for terminating his employment were a pretext for retaliation.

16. The memorandum advising Plaintiff of his termination stated the following as reasons for Plaintiff's termination: being absent without leave on August 30, 2013; arriving late to the special duty assignment on August 22; office abandonment; not working well with fellow team members. JE 2.

17. Each of the four stated reasons for Plaintiff's termination is supported by evidence.

18. On August 30, 2013, Ms. Beard declared Plaintiff AWOL after he showed up at 1:39 p.m., instead of his 10:00 a.m. scheduled start time. DE 16.

19. On August 22, 2013, Plaintiff arrived one hour late to his special duty assignment at the Installation Family Fun Fest. DE 8; Tr. 162:1-3.

20. Plaintiff did not abide by Mr. Dunn's instructions to the staff in May and August 2013 to not abandon the office and to notify team members of their whereabouts when leaving. Tr. 233:1-25; 234:1-4; 297:25-300:11; DE 17.

21. Plaintiff has not met his burden of establishing, by a preponderance of the evidence, that Defendant acted with retaliatory animus.

*Unpaid Wages*

22. The Court has jurisdiction over Plaintiff's claim for unpaid wages under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), 1491.

23. The Little Tucker Act provides a limited waiver of sovereign immunity for certain contractual and non-contractual claims asserting the government is responsible for paying a plaintiff, where the sum at issue is less than $10,000. 28 U.S.C. §§ 1346(a); 1491.

24. Because Plaintiff seeks $273.22 in unpaid wages, the Little Tucker Act provides Plaintiff's limited waiver of sovereign immunity for this Court to have jurisdiction.

25. Plaintiff has not met his burden of establishing, by a preponderance of the evidence, that he was not compensated for hours he in fact worked.


Dated: August 4, 2022                                     /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge